## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILSON J. CAMPBELL,<br><br>Plaintiff,<br><br>vs.<br><br>THE SUPREME COURT OF NEW JERSEY; JUDGE MAURICE GALLIPOLI (Assignment Judge for Hudson County, Superior Court of New Jersey, in his individual capacity); CANDACE MOODY (Disciplinary Counsel, for Advisory Committee on Judicial Conduct, in her individual capacity), JOHN TONELLI (Executive Director of the Advisory Committee on Judicial Conduct, in his individual capacity);  and  JOHN DOE EMPLOYEES I-X (fictitious names provided, actual names presently unknown).<br><br>Defendants. | Civil Action No._____<br><br>Hon._____<br><br><br>**COMPLAINT<br>AND JURY TRIAL DEMAND** |

Plaintiff Wilson J. Campbell by way of complaint against Defendants in this matter, hereby states:

### INTRODUCTION

1.      Judge Maurice Gallipoli ("Judge Gallipoli") unlawfully sought to remove Wilson Campbell ("Campbell" or "Plaintiff"), from his position as a municipal court judge for engaging in a consensual dating relationship with Ann Kirolos ("Kirolos"), a former college professor, employed by the judiciary.

2.      The New Jersey Supreme Court's Policy on Consensual Dating in the Workplace ("Policy on Consensual Dating")[1] allowed such relationships between judges, supervisors and judiciary employees.

3.      Judge Gallipoli nevertheless demanded Campbell's resignation based on the relationship with Kirolos, but Campbell chose not to resign.  Judge Gallipoli stated that he was angered by the relationship and he thought Campbell should "pack up his bags and leave."

4.      Of significance to Judge Gallipoli was the fact that Campbell, a black male, engaged in a dating relationship with Kirolos, a white female.

5.      At the request of Judge Gallipoli, Candace Moody ("Moody"), Disciplinary Counsel for the Advisory Committee on Judicial Conduct ("ACJC"), filed an ethics complaint against Campbell alleging that Campbell's relationship with Kirolos violated judicial canons.

6.      Moody was aware that Kirolos was white and that Campbell was black at the time she filed her complaint. Moody's complaint against Campbell on its face stood in direct contradiction to the Policy on Consensual Dating.

7.      On December 16, 2009 during the ACJC hearing on the matter Judge Nesle Rodriguez ("Judge Rodriguez"), Chief Judge of the Jersey City Municipal Court, testified that dating relationships were allowed between members of the judiciary in New Jersey and that she could not point to any policy that Campbell violated based on the relationship.

---

[1] The Policy on Consensual Dating is more than a decade old with its most recent update on October 29, 2008, by Judge Glenn Grant, Administrative Director of Courts.  The exact same Policy on Consensual Dating was approved by Judge Phillip Carchman on July 3, 2007, Administrative Director of Courts; and approved by Judge Richard Williams, Administrative Director of Courts in May 2000 and April 2004.

8.      When asked what would happen to Campbell if he chose not to resign in response to Judge Gallipoli's demands, Judge Rodriguez testified, "Perhaps consequences that would result wouldn't be worth the impact to his career."

9.      Judge Gallipoli wanted to punish Campbell for his relationship with Kirolos and Moody aided Judge Gallipoli in this effort by misusing the ACJC complaint process.

10.     Judge Gallipoli and Moody, acting under color of law, discriminated against Campbell based on his race, sex and marital status in violation of his rights under the New Jersey Law Against Discrimination ("LAD"), the New Jersey State Constitution, the United States Constitution and federal law for engaging in a consensual dating relationship with Kirolos.

## PARTIES

11.     Plaintiff Wilson J. Campbell is an adult black male residing in St. Thomas, U.S. Virgin Islands.  During part of the time period relevant to this suit Campbell served as a municipal court judge in Jersey City and an attorney in private practice in New Jersey.

12.     Defendant, the New Jersey Supreme Court is a governmental entity of the State of New Jersey with its offices located at the Hughes Justice Complex, 25 Market Street, Trenton, New Jersey.

13.     Defendant Judge Maurice Gallipoli is an adult white male whose business address is the Brennan Courthouse, 595 Newark Avenue, Jersey City, New Jersey.  At all relevant times, Judge Gallipoli served in a management capacity as the Assignment Judge of the Superior Court in Hudson County acting under the direction and authority of the Supreme Court of New Jersey. In this capacity Judge Gallipoli had supervisory authority over Campbell. Judge Gallipoli is sued in his individual capacity.

14.     Defendant Candace Moody is an adult white female whose business address is Hughes Justice Complex, 25 Market Street, Trenton, New Jersey.  At all relevant times, Moody served as the Disciplinary Counsel for the Supreme Court of New Jersey. In this capacity the Supreme Court of New Jersey gave Moody the authority to file formal disciplinary charges against all judges in the State of New Jersey.  She is sued in her individual capacity.

15.     Defendant John Tonelli ("Tonelli") is an adult white male whose business address is the Hughes Justice Complex, 25 Market Street, Trenton, New Jersey.  At all relevant times, Tonelli served in a management capacity as the Executive Director of the Advisory Committee on Judiciary Conduct for the Supreme Court of New Jersey.  In this capacity he supervised Moody, investigated complaints against judges, and aided Moody in the filing of ethics complaints. He is sued in his individual capacity.

16.     Defendants John Does 1 – 10 are adult individuals, names and addresses currently unknown, who at all relevant times were judiciary employees under the direction and authority of then New Jersey Supreme Court who participated in the events below.  They are sued in their individual capacities.

17.     Article 6, Section 2, Paragraph 3 of the Constitution of the State of New Jersey provides in pertinent part, "The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts."

18.     The Supreme Court is obligated under the Constitution of the State of New Jersey to exercise its rule-making authority over all courts, judges and lawyers in the State.

19.     The New Jersey Rules of Court 2:15 provides in relevant part that:

> To implement N.J.S.A. 2B:2A-10, providing for suspension prior to hearing, and to assist otherwise in fulfilling the administrative responsibilities of the court, the Court establishes a committee of this Court to be known as the Advisory Committee on Judicial Conduct.

20.     The Supreme Court has given the ACJC unfettered discretion to determine which complaints the ACJC chooses to file against judges without meaningful oversight.

21.     Under New Jersey's Constitution and the United States Constitution, intimate decisions relating to personal matters between consenting adults are fundamental privacy rights protected under the law.   Adverse action in response to exercising such fundamental rights is a violation of public policy.

## JURISDICTION AND VENUE

22.     This action arises under 42 U.S.C. §§ 1981, 1985, and 1988 – laws of the United States.   As part of the same case and controversy, Plaintiff also asserts related and intertwined state-law claims for violation of civil rights under N.J.S.A. 10:5-1 et seq., N.J.S.A. 59:1-1, et seq., and civil conspiracy.

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1343(a), and 1367.

24.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.**     **Background**

25.     Campbell is a black male and former municipal court judge in Jersey City, New Jersey.  He was a part-time municipal court judge from October 2007 to October 2009.

26.     Campbell's position as a municipal court judge required him to serve on the bench four nights per week and to be "on call" at various times throughout the year.

27.     As a municipal court judge, Campbell was subject to the employment policies and procedures dictated by the Supreme Court of New Jersey for all judges in the State of New Jersey.

28.     As a municipal court judge, Campbell was subject to disciplinary employment policies of the Supreme Court of New Jersey that were enforced by the Supreme Court and the ACJC.

29.     Campbell also served as an attorney in New Jersey during the relevant time periods where he represented numerous business clients in private practice.

30.     In April 2008, Campbell became involved in a consensual dating relationship with Kirolos, a white female, judiciary employee.

**B.**     **Judge Gallipoli Demands Campbell's Resignation Before an Investigation**

31.     Judge Gallipoli, the Assignment Judge for Hudson County, learned about the dating relationship between Campbell and Kirolos in June 2008 and demanded that Campbell, immediately resign from the bench.

32.     By the time Judge Gallipoli learned of the relationship between Campbell and Kirolos in June 2008, the relationship had already ended.

33.     On or about June 30, 2008, Judge Gallipoli informed Campbell that if he did not resign, Judge Gallipoli would make facts related to the relationship public and seek formal charges through the ACJC to adversely affect Campbell's career and business opportunities.

34.     On or about June 30, 2008, Campbell advised Judge Galliopli that Campbell would not resign from the bench based on his past dating relationship with Kirolos, which did not violate the judiciary policy.

35.     The Policy on Consensual Dating instituted in May 2000 allowed dating relationships between judges, supervisors and judiciary employees.

36.     Even though dating relationships were allowed between judges and judiciary employees, Judge Gallipoli acted in concert with Moody and members of the ACJC to punish Campbell based on his race, sex and marital status for engaging in the relationship with Kirolos.

37.      When Campbell informed Judge Gallipoli that Campbell would not resign, Judge Gallipoli contacted Judge Phillip Carchman, Administrative Director of Courts, and stated in an e-mail, "Anticipating he [Judge Campbell] will not resign, I think at the very least a suspension is called for pending a full investigation and the resolution of any and all charges that may be brought against him." (E-mail from Judge Gallipoli to Judge Carchman, dated June 30, 2008, with a copy to Chief Justice Stuart Rabner).[2]

38.     On or about June 30, 2008 Judge Gallipoli temporarily suspended Campbell from his position as a municipal court judge when Judge Gallipoli ordered Campbell not to return to work.

---

[2] Even in cases where judges are charged with sexual harassment, there is no automatic suspension pending an investigation.  Kirolos never alleged that Campbell sexually harassed her and Kirolos never filed a complaint against Campbell based on the relationship or for any other reason.

39.     The suspension took place without notice or hearing and affected Campbell's property interest in his position as a municipal court judge where he was appointed to the bench for three years by the City of Jersey City from October 2007 to October 2010.

40.     Judge Galliopli then sent a memorandum to Judge Carchman which stated, "I suggested to Judge Campbell that he should seriously consider resignation.  As previously advised, he has declined that invitation and has informed me that he intends to remain as a judge of the court… I assume a complaint against Judge Campbell will be filed with the ACJC."  (Memorandum from Judge Gallipoli to Judge Carchman, dated July 1, 2008).

C.     **Tonelli Conducts a Sparse Investigation that Does Not Support Campbell's Resignation**

41.     The ACJC conducted an investigation in the matter and interviewed a total of three witnesses, which did not include Campbell.

42.     The first two witnesses, Kirolos and Rebecca Mason ("Mason"), Assistant Court Director of the Jersey City Municipal Court, were interviewed on September 26, 2008.

43.     Kirolos informed the ACJC that the relationship was consensual.

44.     Kirolos and Mason informed the ACJC that Campbell was not Kirolos's supervisor. (Statement of Kirolos to ACJC, dated September 26, 2008, Page 6, Line 21 – 23), (Statement of Mason to ACJC, dated September 26, 2008, Page 11, Lines 15 – 19).

45.     The ACJC took no substantive action for three months.

46.     Tonelli interviewed the ACJC's last witness, Judge Gallipoli, on January 14, 2009.

**D.**   **Judge Gallipoli Reaffirms His Desire to Force Campbell's Resignation**

47.      Judge Gallipoli made it unequivocally clear to Tonelli that Judge Gallipoli wanted Campbell off the bench based on Campbell's relationship with Kirolos. Judge Gallipoli stated:

> I'm not so sure he [Judge Campbell] was as contrite as I would have liked him to be and I know, quite frankly, that I thought the easy way out of this for everyone concerned was for him to resign and I put it to him that I thought he should seriously consider resigning.

(Statement of Judge Gallipoli to ACJC, dated January 14, 2009, Page 7, Line 23 – Page 8, Line 3) (emphasis added).

48.      Judge Gallipoli again reiterated to Tonelli:

> "… the easiest way for everyone to just get on with their life, him and her included was for him to pack up his bags and leave…And when I say, I suggested it [resignation] to him [Judge Campbell], suggested is not really expressing how strongly I put it to him."

(Statement of Judge Gallipoli to ACJC, dated January 14, 2009, Page 10, Line 23 – Page 11, Line 2)(emphasis added).

49.      Judge Gallipoli wanted to prohibit consensual dating relationships between judiciary employees even though such relationships were allowed under the Policy on Consensual Dating.

50.      Tonelli asked Judge Gallipoli if he was aware of a particular policy in Jersey City Municipal Court that prohibited judges from engaging in dating relationship with court employees.  Judge Gallipoli stated:

> I don't know whether there was a formal policy but I dare say the City must have some sort of a policy over there and, quite frankly, you don't really need a policy that's written out and spelled out…It's not unless you are deaf, dumb and blind you shouldn't be doing this.[3]

---

[3] Although Judge Gallipoli suggest that judges who engage in dating relationships with judiciary employees have a moral or mental defect, it should be noted that the Honorable Justice William Brennan of the United States Supreme Court wed his secretary shortly after his wife passed away.  Justice Brennan, a native of New Jersey

(Statement of Judge Gallipoli to ACJC, dated January 14, 2009, Page 12, Lines 16 – 22) (emphasis added).

51.     Tonelli also asked Judge Gallipoli if he was aware of a judiciary policy that prohibited judges from engaging in dating relationships with judiciary employees.  The colloquy went as follows:

> Q     In terms of any policies in the judiciary, are you aware of any that deals directly on this subject [judges dating court employees]?
>
> A     I mean, yes.  I mean, I don't think you should be doing this at all.  I mean all you have to do is read a couple of cases or basically read the law journal to see how judges have gotten in trouble in the past.  It sort of like should be the clue that this is not the way to go.

(Judge Gallipoli Statement to ACJC, dated January 14, 2009, Page 12, Line 23 – Page 13, Line 4) (emphasis added).

52.     At the time Judge Gallipoli gave that response to Tonelli, the Policy on Consensual Dating was dated October 29, 2008.  The prior Policy on Consensual Dating was dated July 3, 2007.  The Policy on Consensual Dating contained the exact same language which had been in existence since May 2000 and it allowed for such relationships.  There was also no policy in the Jersey City Municipal Court that prohibited such relationship between judges and judiciary employees.

53.     Judge Gallipoli presided on the Superior Court bench for more than ten (10) years and as Assignment Judge for Hudson County for four (4) years at the time he learned of Campbell's relationship. Judge Gallipoli knew or should have known of the Policy on Consensual Dating.

54.     As the Assignment Judge in Hudson County, Judge Gallipoli held a position of management in the judiciary which required him to adhere to the policies of the New

---

and one of the most respected jurists on the U.S. Supreme Court, worked daily with his wife who served in her

Jersey Supreme Court whether those mandated policies fit with Judge Gallipoli's personal beliefs or not.

**E.      Judge Gallipoli Ignores the Supreme Court's Policy and Seeks Campbell's Resignation**

55.      The New Jersey Supreme Court placed the Policy on Consensual Dating directly in its Judiciary Policy Statement on Equal Employment Opportunity, Affirmative Action and Anti-Discrimination ("EEO Policy Statement").

56.      The EEO Policy Statement is a two page document that begins with the following directive:

> The Chief Justice and Supreme Court of New Jersey declare the following to be the policy of the New Jersey Judiciary in order to ensure equal opportunity for all Judiciary employees and applicants for employment, and in order to ensure that all court users, volunteers, attorneys, litigants, witnesses or others who come in contact with the court system are treated in a non-discriminatory manner with civility, dignity, and respect.   All who serve in the Judicial Branch are responsible for implementing this policy.

(EEO Policy Statement, dated July 3, 2007 and October 29, 2008).

57.      Judge Gallipoli incorrectly asserted that a dating relationship between a judge and a judiciary employee was inappropriate, prohibited and not allowed by the New Jersey Supreme Court. However, the Policy on Consensual Dating begins with the statement, "Consensual dating relationships between Judiciary employees are generally not the Judiciary's business." (EEO Policy Statement, July 3, 2007 and October 29, 2008)(emphasis added).

58.      The Policy on Consensual Dating concludes with the statement:

> For justices, judges and judiciary employees subject to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, et seq., failure to give proper notice to the supervisor's immediate superior [of the relationship] may result in the denial of legal representation and indemnification by the State in the event that a

_____

capacity as his secretary for numerous years until he retired from the bench.

discrimination or sexual harassment lawsuit is filed in connection with the relationship.[4]

(EEO Policy Statement, dated July 3, 2007 and October 29, 2008)(emphasis supplied).

59.     Nowhere does the policy prohibit consensual dating relationships between judges and judiciary employees nor does it provide additional consequences for those who choose to keep such relationships private, since to do so would be a violation of State privacy rights.[5]

60.     Judge Gallipoli treated Campbell different from Kirolos, a female, in light of the dating relationship by demanding Campbell's resignation. Judge Gallipoli stated, "Quite frankly, you know, this was a woman who worked at the Court and she shouldn't get fired for this relationship." (Statement of Judge Gallipoli to ACJC, dated January 14, 2009, Page 10, Lines 14 – 15).

61.     Judge Gallipoli could cite no authority to warrant Campbell's resignation, but he nevertheless sought Campbell's resignation. In Judge Gallipoli's interview with the ACJC the following dialogue occurred:

---

[4] This language grants the judge or supervisor the option to maintain privacy or report the relationship with the understanding that some perils may result from failing to report the relationship if a claim of sexual harassment or discrimination is made.  The language in the policy was careful not to punish consenting adults or require them to obtain the "blessings from the government" before engaging in such relationships.  As the United States Supreme Court in Lawrence v. Texas, 539 U.S. 558, 574 (2003), stated, "It is the promise of the Constitution that there is a realm of personal liberty which the government may not enter. Id. at 578 (citing Planned Parenthood Southeastern Pa. V. Casey, 505 U.S. 833, 847 (1992).  Individual decisions of married and unmarried persons concerning the intimacies of their physical relationship are a form of  "liberty" protected by the Due Process Clause of the Fourteenth Amendment. Id. (citations omitted). The right to privacy is a fundamental right protected by the New Jersey State Constitution. In re Martin, 90 N.J. 295, 318 (1982). The right to privacy is one of the "natural and inalienable rights" recognized by the state constitution. Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 96 (1992).

[5] The New Jersey Supreme Court has explicitly articulated and broadly defined a right of privacy that protects individuals from unwarranted intrusion into matters of intimate personal concern.  See In re Grady, 85 N.J. 235, 249-50 (1981). Employer policies prohibiting consensual dating relationships violate an employees' state constitutional right to privacy. Slohonda v. United States Parcel Service, Inc., 193 N.J. Super. 586 (App. Div. 1984).  Voluntary dating relationships in the workplace do not constitute workplace discrimination. See Erickson v. March, 117 N.J. 539 (1990).  Intimate relationships in the workplace do not constitute "misconduct" in the workplace simply because they involve a supervisor and subordinate.  See K.S. v. ABC Professional Corp., 330 N.J. Super. 288 (App. Div. 2000).

Q.     In the past four years since you've been assignment judge, have you had any other occurrences whether it was with this judge [Judge Campbell] or any other judge under your authority that has done something similar to this?

A.     Yes, unfortunately and I guess that's going to be the second interview.

Q.     My question is how did you handle that matter?

A.     The same way. With a report, basically trying to get the matter resolved although in the one we're going to talk about for a lot of different reasons I guess I didn't suggest that the person [Judge DeBello] resign. <u>But in this particular case I thought that the person [Judge Campbell] should resign. It was a part time position and I just thought it was totally inappropriate. Not that I don't think the other situation [involving Judge DeBello] that we're going to discuss was in any way more appropriate.</u>

(Statement of Judge Gallipoli to ACJC, dated January 14, 2009, Page 13, Lines 5 – 20).

### Diagrams of Discrimination by Judge Gallipoli

| **Judge DeBello (White, Male)** | **Judge Campbell (Black, Male)** |
|---|---|
| Warned regarding Policy | No Warning |
| No Demand for Resignation when it was clear that Judge DeBello violated policies and continued to violate policies after being warned | Demanded Resignation immediately without legal or factual basis |
| No Suspension | Temporary suspension by Judge Gallipoli |
| Judge Gallipoli made no Suggestion that actions would be made public or would damage career and Judge Gallipoli kept the matter secret for several months until Judge DeBello repeated policy violations | Judge Gallipoli threatened Campbell that if he did not resign the matter would become public |
| Interviewed regarding policy violations | No interview opportunity given to Judge Campbell |
| Resolved case in less than six (6) months | Took approximately two years to reach a decision.  Issued final decision days before State of Limitations after State placed on Notice of Campbell's intent to file suit |
| **Judge DeBello received a Censure, one level below Suspension, for his actions but <u>Judge Gallipoli Did Not Demand Judge DeBello's Resignation</u>** | **Judge Campbell received a Private Reprimand, the lowest form of public discipline, but <u>Judge Gallipoli Demanded Campbell's Resignation</u>** |

**Levels of Punishment for Judges Highest to Lowest**

| |
|---|
| Removal from bench |
| Suspension from bench |
| Censure |
| Admonishment |
| Public Reprimand |

62.     Judge Gallipoli stated that he handled the matters the same, when in fact he first warned Judge DeBello and only made reports to the ACJC after Judge DeBello continued to violate policies of the judiciary.[6]   Judge Gallipoli also never sought Judge DeBello's resignation. Judge Gallipoli did not handle the matters involving Judge DeBello and Campbell "the same way," due in part to Campbell's race.

**F.     Moody Aids Judge Gallipoli in Punishing Campbell by Filing Formal Charges Against Campbell for Not Submitting His Resignation**

63.     The ACJC treated Campbell different based on race when the ACJC interviewed Judge DeBello, but did not interview Judge Campbell before filing charges.

64.     The ACJC treated Campbell different based on race and sex when the ACJC interviewed Kirolos regarding her relationship with Campbell, but did not interview Campbell regarding the relationship.

65.     On February 2, 2009, the ACJC filed an ethics complaint against Campbell which charged:

> By engaging in an intimate relationship with a subordinate municipal court employee over whom he exercised supervisory control Respondent violated Canons 1 and 2A of the Code of Judicial Conduct in that he did not maintain

---

[6] Judge DeBello was censured for using his judiciary e-mail in violation of the Judiciary IT Policy by sending messages of an intimate and personal nature to his former law clerk.  Judge DeBello also made an unsolicited contact with a person who appeared before his court to obtain employment for his former law clerk.  Judge DeBello gave misleading responses under oath regarding the relationship and the use of his judiciary e-mails. Campbell did not commit any of the acts alleged against Judge DeBello. Judge DeBello was never charged with an ethics complaint for his relationship with his former law clerk. See In re DeBello, Order D-13 September 2009.

high standards of conduct and did not act in a manner that promotes confidence in the integrity and impartiality of the Judiciary.[7]

(ACJC Complaint against Campbell, Paragraph 9, dated February 2, 2009.)

66.     At all times before and after the filing of the ACJC's complaint, Judge Gallipoli, Moody, and Tonelli knew or should have known that in the history of the New Jersey Judiciary no judge had ever been charged with an ethics complaint for a consensual dating relationship with a judiciary employee following the issuance of the Policy on Consensual Dating in 2000, even though a number of judges had engaged in such relationships.

67.     In April 2009, Campbell learned of the less favorable treatment he received from Judge Gallipoli and members of the ACJC based on race, sex and marital status.

68.     Campbell placed the State of New Jersey on notice of his intention to file suit within a timely manner, pursuant to the New Jersey Tort Claims Act, 59:1-1, et seq., but Campbell gave the Defendants almost two years to take corrective action before Campbell decided to file suit.

### G.   The ACJC Aids Judge Gallipoli in Punishing Campbell for Not Submitting His Resignation

69.     After receiving notice of Campbell's intent to file suit, Judge Gallipoli, Moody, Tonelli and John Does I-X, acted in concert to intentionally delay the resolution of the ACJC complaint filed against Campbell in retaliation to cause Campbell prolonged damage to his reputation, emotional distress, loss of business opportunities and other damages.

---

[7] No judicial canon prohibits dating relationships between judges and judiciary employees, nor do the canons suggest that such relationships create an appearance of impropriety.  The Policy on Consensual Dating allowed dating relationships between judges, supervisors and judiciary employees.

70.     The diagram below provides an example of the judiciary's expedient resolution of other judiciary complaints compared to Campbell's case.

| Judge | Complaint | Presentment | SC Order[8] | Final[9] | Days |
|-------|-----------|-------------|-------------|----------|------|
| J. Rivera-Soto | May11,2007 | Jul. 11, 2007 | Jul. 20,2007 | Jul. 20, 2007 | 70 |
| J.Sibly | Sep. 12,2007 | May 19, 2008 | Jun. 16, 2008 | Jun. 16, 2008 | 308 |
| J.McElroy | Mar. 7, 2008 | Jul.30,2008 | Sep. 29, 2008 | Sep.29,2008 | 206 |
| J. Rodriguez | Mar.12,2008 | Jul.30, 2008 | Sep.22,2008 | Sep.22,2008 | 194 |
| J.Sasso | Mar.13,2008 | Mar. 2009 | Jun. 2, 2009 | Jun.2, 2009 | 446 |
| J.Toth | Jan. 5, 2009 | Jul. 14, 2009 | Sep. 9, 2009 | Sep.9, 2009 | 247 |
| J. Boggia | Jan. 5, 2009 | May 14, 2009 | Jun. 1, 2009 | Jul. 27, 2010 | 568 |
| J.Campbell | Feb. 2, 2009 | Feb. 25, 2010 | Apr.13, 2010 | Jan.28,2011[10] | 725+ |
| J.DeBello | Mar. 4, 2009 | Sep. 21, 2009 | Nov. 16,2009 | Nov.16, 2009 | 257 |
| J. Citta | Apr. 1, 2009 | Jan. 27, 2010 | Mar. 8, 2010 | Mar. 8, 2010 | 341 |
| J. Covery | Apr. 1, 2009 | Jan. 27, 2010 | Mar. 8, 2010 | Mar. 8, 2010 | 341 |

71.     The ACJC acknowledged that the relationship between Campbell and Kirolos was consensual.  The ACJC acknowledged that the Policy on Consensual Dating allowed such relationships, and then relied on In re Hyland, a case that predated the Policy on Consensual Dating by fifteen (15) years to suggest that Campbell's relationship was inappropriate.[11]

**H.     Moody Aids Judge Gallipoli in Punishing Campbell by Placing Campbell in a False Light for Not Submitting His Resignation**

72.     Kirolos never alleged that Campbell sexually harassed her and Kirolos never filed a complaint of sexual harassment against Campbell.  Kirolos admitted that her

---

[8] " SC Order" is an abbreviation for the New Jersey Supreme Court Order issued on the matter or the Order to Show Cause.

[9] "Final" refers to the conclusive disposition on the matter by the New Jersey Supreme Court.

[10] Decision rendered less than a week prior to the statute of limitations in the case after the Supreme Court was placed on notice of Campbell's intent to file suit.

[11] The ACJC relied on the case of In re Hyland, 101 N.J. 631 (1985) to support its recommendation for a public reprimand against Judge Campbell, but failed to note that Hyland had never been adopted by the New Jersey Supreme Court.  In Hyland it was alleged that Judge Hyland sexually harassed his secretary for several years, traded sex toys with her in his chambers and ultimately fired her when she chose to end the relationship. No such claims were made against Judge Campbell.  It appears that at the time of Hyland the New Jersey Supreme Court

relationship with Campbell was consensual and that she was disappointed when the relationship ended.

73.    In the ACJC Complaint filed against Campbell, Moody acted with reckless disregard for the truth in an effort to intentionally damage Campbell's professional reputation by suggesting that Kirolos overdosed on medication and required treatment as a direct result of her relationship with Campbell.

74.    Moody knew that Kirolos's supervisor told Kirolos that if she did not go to the hospital "no one would believe the whole thing [relationship with Judge Campbell] happened." (Statement of Kirolos to ACJC, dated September 26, 2008, Page 11, Line 1 – 4). Moody also knew that Kirolos went to the hospital and was sent home the same evening with no treatment and no finding that Kirolos needed medical attention.

75.    Moody in her complaint erroneously suggested that Campbell caused Kirolos to "overdose on medication" because he ended the relationship in an effort to paint Campbell in a negative light.

76.    In fact, Campbell had no contact with Kirolos for days prior to the date on which Kirolos was alleged to have "overdosed" on medication.

77.    Moody's unfair characterization of facts which she knew were not true placed Campbell in a false light and severely damaged Campbell's reputation.

I.    **Moody Relies on Judge Gallipoli's Statements and Denies Campbell an Interview**

78.    At the Supreme Court hearing on the ACJC complaint filed against Campbell, the Supreme Court asked Moody if the ACJC ever interviewed Campbell to hear

_____

had not issued a formal policy on dating relationships concerning judges, superiors and subordinates. However, in 2000, the New Jersey Supreme Court issued the Policy on Consensual Dating authorizing such relationships.

17

his side of the facts before the ACJC filed its complaint against Campbell.  The colloquy

proceeded as follows:

> Q.   Ms. Moody in the rules that govern the actions of the ACJC there are at
> least two choke points as I refer to them where the ACJC is given the
> discretion, but not the obligation I understand to interview the
> respondent in a matter.  The first one happens during the preliminary
> investigation period and the second one happens after the preliminary
> investigation period has occurred and in both instances the ACJC can
> notify the Respondent of what the allegations are, can provide the
> information of who the grievant is and can take a statement under oath
> from the Respondent.  <u>And, from what I gather that did not happen here
> at all.</u>
>
> A.   You are correct Justice the ACJC did not get a statement from Mr.
> Campbell.
>
> Q.   Why?
>
> A.   Mr. Campbell had met with Judge Gallipoli three, perhaps four days
> following the incident which brought this relationship to the attention
> of the judiciary and given that fact and that Judge Gallipoli had spoken
> with Mr. Judge Campbell  <u>the ACJC was provided with Judge
> Gallipoli's statement of that meeting and what had occurred</u> the ACJC
> didn't feel that it was necessary. They [the ACJC] had all the
> information that they needed.

(Statement of Moody during Supreme Court Oral Arguments on June 15, 2010)(emphasis
added)(See http://njlegallib.rutgers.edu/supct/args/D_71_09.php, Time: 1:07:45 – 1:09:10).

79.      The ACJC accepted the statements of Judge Gallipoli *carte blanche* and

interviewed Judge Gallipoli without interviewing Campbell even though the ACJC knew that

Judge Gallipoli sought Judge Campbell's immediate removal from the bench and that Judge

Gallipoli had told Campbell to "pack up his bags and leave" based on the relationship.

(Statement of Judge Gallipoli to ACJC, dated January 14, 2009, Page 10, Line 25).

80.      Although Moody stated to the Supreme Court that the ACJC had "all the

information they needed" before Moody filed the complaint against Campbell, the facts show

that the ACJC had not completed its investigation at the time Moody rushed to the court to lodge her complaint against Campbell.

81.    The ACJC had not received any documents regarding the work assignments of  Kirolos and was awaiting documents from the Jersey City Municipal Court even after Moody  filed the complaint against Campbell.

82.    Gerald Buccafusco ("Buccafusco"), Director of the Jersey City Municipal Court, wrote a letter to the ACJC in response to a request from the ACJC more than six weeks after the ACJC filed its complaint against Campbell.

83.    There Buccafusco stated, "I do not have any documentation of the assignment [of Kirolos] to any particular courtroom." (Letter from Gerald Bucafucco to ACJC, dated March 12, 2009 and sent via facsimile).

84.    Thereafter Jennifer Endrzejewski ("Endrzejewski") of the ACJC contacted Buccafusco by telephone on March 12, 2009 and asked Buccafusco  to confirm that the Jersey City Municipal Court had no documents assigning Kirolos to Campbell's court.

85.    After checking the courts records a second time, Buccafusco wrote a letter to Endrzejewski wherein Buccafusco stated, "This is a follow-up to our telephone conversation on March 12, 2009 with regard to the information I sent you via facsimile regarding Ms. [Kirolos]…To the best of my knowledge the information is complete and accurate. (Letter from Gerald Buccafusco to ACJC, dated March 13, 2009 and sent via facsimile).

86.    Tonelli lead the investigation for the ACJC and never interviewed Campbell or Kirolos's supervisor, the chief bailiff.  Tonelli also failed to research applicable policies of the New Jersey Supreme Court.

87.     The ACJC had not completed its investigation at the time Moody filed the ethics complaint against Judge Campbell.

**J.    Moody was Aware of Married Couples in the Judiciary Yet Moody Sought to Punish Campbell for a Dating Relationship Prior to Marriage**

88.     Although Judge Gallipoli pressed the ACJC to file a formal complaint against Campbell on the basis that Campbell's relationship with Kirolos violated judiciary policy, Judge Gallipoli, Moody, Tonelli and members of the ACJC knew or should have known of a number of marriages between New Jersey judges, supervisors and subordinate judiciary employees.  In fact, a judge who is a member of the New Jersey Supreme Court's administrative staff is married to a subordinate judiciary employee.[12]

89.     A clear fact in this regard is that Campbell and Kirolos were not married while married judges and judiciary employees were allowed to continue their relationships with other judiciary employees without being subjected to punishment or forced to resign from the bench.

90.     Moody treated Campbell different based on marital status when Moody filed charges against Campbell for having a consensual dating relationship with Kirolos away from court, but refused to file charges against a married judge who was found by a judiciary employee receiving oral sex in the judge's chambers from another judiciary employee over whom that judge exercised "supervisory control."[13]

---

[12] The name of said judge and judiciary employee is not revealed here to protect privacy, but may be revealed at the appropriate time with names and positions of other married judiciary supervisor and subordinate employees who received no adverse action as a result of their relationships.

[13] The details of this matter are being withheld at this time since no public charges were filed against the judge, hereafter referred to as Judge "X."  How could the ACJC charge Campbell for a private relationship outside of the court on one hand, yet ignore the fact that a judge uses his chamber to engage in sex with a court employee on the other hand.  The ACJC's claim of its intent to enforce a judiciary policy is merely a cover for its intent to punish Campbell for not submitting to Judge Gallipoli's demands for a resignation.

**K.     Judge Rodriguez Confirms Judge Gallipoli's Intent to Punish Campbell For Not Submitting His Resignation**

91.     More than eighteen (18) months after the judiciary learned of the relationship between Kirolos and Campbell, Judge Rodriguez, the Chief Judge of Jersey City Municipal Court, could point to no policy that prohibited a judge from engaging in a consensual dating relationship with a judiciary employee.  The examination went as follows:

Q     What policy, written policy of the court, did [Judge] Wilson Campbell violate?

A.     <u>I can't answer that specifically</u>.  I know that we have training and it seems clear as to what we can and can't do in terms of being supervisors, <u>but I can't point to any one policy, written policy.</u>

Q     Can people date within the Judiciary?

A     <u>It's my understanding they can date within the Judiciary.</u>

(Testimony of Judge Rodriguez to ACJC, Transcript of ACJC Hearing, dated December 16, 2009)(Page 67, Lines 1 – 9) (emphasis added).

92.     Judge Rodriguez was questioned why Judge Gallipoli asked Judge Campbell to resign.  Judge Rodriguez testified:

Q     Okay.  But he [Judge Gallipoli] asked for his [Judge Campbell's] resignation, isn't that right?

A     Yes.

Q     All right.  And did he [Judge Gallipoli] say why he [Judge Gallipoli] asked for that resignation?

A     Because of the appearance of impropriety.[14] He [Judge Gallipoli] also mentioned to then Judge Campbell that this was a part-time position for him [Judge Campbell]. He [Judge Campbell] worked at a big firm and that would not – <u>if this became public, it would not be something that the firm may necessarily look favorably upon and it could affect his [Judge Campbell's] career.</u>

---

[14] A detailed and thorough review of Judge Gallipoli's Statement to the ACJC reveals that Judge Gallipoli never referenced the Policy on Consensual Dating and he never stated the relationship between Campbell and A.K. created an "appearance of impropriety."

(Testimony of Judge Rodriguez to ACJC, Transcript of ACJC Hearing, dated December 16, 2009, Page 79, Line 20 – Page 80, Line 2)(emphasis supplied).

93.      Judge Rodriguez, who was present during the interview between Judge Gallipoli and Judge Campbell, gave further assessment of what Judge Gallipoli expressed to Judge Campbell as follows:

> Q    Okay.  Did he – and your explanation a moment ago suggested that, because this was a part-time position, can I use the term that Judge Gallipoli suggested it [Judge Campbell's position on the bench] wasn't worth the fight over it?
>
> A    <u>Perhaps consequences that would result wouldn't be worth the impact to his career.</u>

(Testimony of Judge Rodriguez to ACJC, Transcript of ACJC Hearing, dated December 16, 2009, Page 80, Lines 7 – 12) (emphasis added).

94.      Judge Rodriguez was also asked about Judge Campbell's response when questioned about his relationship with Kirolos as follows:

> Q    And, of course, once confronted – once questioned, Campbell was upright and honest with Judge Gallipoli that particular day, isn't that right?
>
> A    He was forthright.

(Testimony of Judge Rodriguez to ACJC, Transcript of ACJC Hearing, dated December 16, 2009, Page 89, Lines 10 – 15).

**L.    The ACJC Panel Improperly Considers Campbell's Discrimination Complaint Against Judge Gallipoli**

95.      During the ACJC hearing on the complaint filed against Campbell a member of the ACJC Panel specifically inquired into the status of the discrimination complaint that Campbell filed against Judge Gallipoli.   Alice Olick ("Olick") of the ACJC panel stated, "<u>I just wonder if counsel could tell us what the status of Judge Campbell's</u>

discrimination complaint against Judge Gallipoli is at the present time." (Transcript of ACJC Hearing, dated December 16, 2009, Page 109, Line 24 – Page 110, Line 2)(emphasis added).

96.     After Olick inquired into the status of Campbell's discrimination complaint, Justice Alan Handler, who served as the Chairman of the ACJC panel stated, "Well, if it is important, it's something that the Committee itself could pursue." (Transcript of ACJC Hearing, dated December 16, 2009, Page 110, Lines 8 – 9).

97.     Both Justice Handler and Olick failed to appreciate that Campbell's complaint against Judge Gallipoli had no bearing whatsoever on whether Campbell violated judicial canons by engaging in a dating relationship with Kirolos, the type of relationship allowed by the Policy on Consensual Dating.  It was improper in any manner, shape or form for the ACJC Panel to consider the status of Campbell's complaint against Judge Gallipoli.

98.     The discrimination complaint that Campbell filed against Judge Gallipoli was to remain confidential, but its disclosure to the ACJC makes it clear that members of the judiciary were making "unofficial" contact with members of the ACJC panel to ensure that Campbell would receive a recommendation of punishment as a cover up for the coordinated acts of Judge Gallipoli, Moody and Tonelli.

99.     The Supreme Court is charged with oversight of judiciary employees and ACJC members.   Also, the Supreme Court is charged with enforcing the EEO Policy Statement, the New Jersey State Constitution, the United States Constitution as well as applicable state and federal laws.

100.     Although the Policy on Consensual Dating is contained in the two (2) page EEO Policy Statement, it is clear that the Supreme Court took no affirmative actions to train the Defendants on the EEO Policy since Judge Gallipoli, the Assignment Judge for Hudson

County, Judge Rodriguez, the Chief Judge of the Jersey City Municipal Court, John Tonelli, Executive Director of the ACJC, and Candace Moody, Disciplinary Counsel for the ACJC, were all unaware of the Policy on Consensual Dating which had existed for almost a decade at the time Moody filed the complaint against Campbell.

101.     The Supreme Court is also charged with hiring, training, and retaining members of the judiciary and the ACJC.   The facts herein suggest negligence in this regard.

## COUNT ONE
### (Equal Protection – Federal Violation)

102.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

103.     Campbell has a right to be protected under 42 U.S.C. § 1981 from state action that amounts to unequal treatment and adverse action against Campbell based on race.

104.     Campbell has a right to be protected from state action that deprives Campbell of his constitutional rights.

105.     The actions of Defendants described above violated Campbell's right to be free from unlawful race discrimination by state action.

106.     As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under federal law.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT TWO
### (Civil Conspiracy – Federal Violation)

107.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

108.    Plaintiff has a right to be protected under 42 U.S.C. § 1985 from state action that amounts to concerted efforts on the part of state agents to subject Plaintiff to unequal treatment and adverse action based on Plaintiff's race.

109.    Campbell has a right to be protected from state action that deprives Campbell of his constitutional rights.

110.    The actions of defendants described above violated Campbell's right to be free from unlawful race discrimination and concerted efforts of state actors to conspire against Campbell based on race.

111.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under federal law.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT THREE
### (Discrimination by Judge Gallipoli – LAD)

112.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

113.     Defendant Judge Gallipoli attempted to force Campbell, a black male, to resign from his position as a municipal court judge for having a consensual dating relationship with Kirolos, a white female.

114.     When Campbell chose not to resign Judge Gallipoli aided and abetted by Moody sought to punish Campbell through the filing of a baseless ethics complaint.

115.     Judge Gallipoli compelled adverse action against Campbell due in part to Campbell's race, sex or marital status.

116.     The actions of Defendants described above violated Campbell's right to be free from unlawful discrimination.

117.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law Against Discrimination ("LAD").

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT FOUR
### (Retaliation by Judge Gallipoli – LAD)

118.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

119.    Campbell filed a discrimination complaint against Judge Gallipoli in April 2009.

120.    Judge Gallipoli aided and abetted by another compelled adverse action against Campbell in response to the discrimination complaint filed against Judge Gallipoli.

121.    The actions of Defendants described above violated Campbell's right to be free from adverse action for exercising a protected right.

122.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law Against Discrimination.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT FIVE
### (Discrimination by Moody – LAD)

123.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

124.     Defendant Moody took adverse action against Campbell due in part to Campbell's race, sex or marital status.

125.     Moody was aided and abetted by another in the adverse action she took against Campbell.

126.     The actions of Defendants described above violated Campbell's right to be free from unlawful discrimination.

127.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law Against Discrimination.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

**COUNT SIX**
**(Retaliation by Moody – LAD)**

128.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

129.     Campbell made a complaint of discrimination against Judge Gallipoli in April 2009.

130.     Moody aided and abetted by another compelled adverse action against Campbell in response to Campbell's complaint against Judge Gallipoli.

131.     The actions of Defendants described above violated Campbell's right to be free from adverse action for exercising a protected right.

132.     As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law Against Discrimination.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT SEVEN
### (Unlawful Interference with Prospective Economic Advantage)

133.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

134.     Defendant Judge Gallipoli aided and abetted by another intentionally interfered with Campbell's prospective economic advantages which included employment and business opportunities after Campbell chose not to resign in response to Judge Gallipoli's demands.

135.   As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT EIGHT
### (Abuse of Process by Moody)

136.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

137.     Defendant Moody used the ACJC complaint process to punish Campbell because Campbell did not submit his resignation upon Judge Gallipoli's demand.

138.    Moody was aided and abetted by another in the adverse actions she took against Campbell.

139.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT NINE
### (Intentional Infliction of Emotional Distress by Defendants)

140.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

141.    The Defendants actions described in the preceding paragraphs amounted to extreme and outrageous conduct that intentionally or recklessly caused Campbell to suffer severe emotional distress.

142.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

## COUNT TEN
### (False Light in the Public's Eye caused by Moody)

143.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

144.    Defendant Moody intentionally sought to damage Campbell's reputation by stating in a formal ethics complaint that Campbell acted in a manner to cause Kirolos to overdose, where Moody knew or should have know that these facts were untrue or Moody made those allegations in reckless disregard for the truth as stated above.

145.   As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law.

WHEREFORE, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

### COUNT ELEVEN
### (Negligent Investigation)

146.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

147.   Defendants Tonelli and Moody failed to thoroughly investigate the matters involving Campbell in that they did not interview Campbell or other relevant witnesses prior to Moody's filing of an ethics complaint against Campbell.

148.   Tonelli and Moody failed to research applicable law and relied solely on the misrepresentations of Judge Gallipoli who cited no law or policy to support his demands for Campbell's resignation.

149.    As a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under the New Jersey Law.

**WHEREFORE**, Plaintiff demands judgment against Defendants for the following:

a) Compensatory Damages;

b) Consequential Damages;

c) Punitive Damages;

d) Attorneys Fees with Enhancement;

e) Costs of Suit;

f) Pre-judgment and Post-Judgment Interest; and

g) Such other relief as the Court may deem as equitable and just.

Respectfully submitted,

s/ Wilson J. Campbell
By:_____
Wilson J. Campbell
Plaintiff Pro-Se
Sapphire Village
6320 Estate Smith Bay
St. Thomas, Virgin Islands
Dated:  January 31, 2011                  wjc@justice.com


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues subject to a jury trial.

Respectfully submitted,

s/ Wilson J. Campbell
By:_____
Wilson J. Campbell
Plaintiff Pro-Se