<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **WILSON J. CAMPBELL,** | : | |
| | : | **Civil Action No.: 11-555 (ES)** |
| **Plaintiff,** | : | |
| | : | **OPINION** |
| **v.** | : | |
| | : | |
| **THE SUPREME COURT OF** | : | |
| **NEW JERSEY, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

<u>**SALAS, District Judge**</u>

**I.    Introduction**

　　Defendants the Supreme Court of New Jersey, Judge Maurice Gallipoli ("Judge Gallipoli"), Candace Moody ("Moody"), and John Tonelli ("Tonelli") seek dismissal of Wilson Campbell's ("Plaintiff" or "Campbell") Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failing to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docket Entry No. 8).  The Court has considered the parties' submissions in support of and in opposition to the instant motion, and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b).  For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

**II.    Jurisdiction**

　　This Court has subject matter over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a), and exercises supplemental jurisdiction for Plaintiff's related state law claims under 28 U.S.C. § 1367.

### III.    Background

Plaintiff, pro se, served as a municipal court judge in Jersey City, New Jersey from October 2007 to October 23, 2009 when he resigned.  (Compl. ¶ 25).[1]  In April 2008, Campbell became involved in a consensual dating relationship with Anna Kirolos ("Kirolos"), who was also employed by the Jersey City municipal court as Plaintiff's bailiff.  (*Id.* ¶ 30).  This relationship ended on June 26, 2008.

On June 30, 2008, Judge Gallipoli—the Assignment Judge of Hudson County—learned of Campbell's relationship with Kirolos and, as a result, "demanded that Campbell [] immediately resign from the bench."  (*Id.* ¶ 31).  More specifically, Judge Gallipoli told Campbell that he should "pack his bags and leave," (*Id.* ¶ 3), and that if Campbell chose not to resign, Judge Gallipoli "would make facts related to the relationship public and seek formal charges through the ACJC[2] to adversely affect Campbell's career and business opportunities." (*Id.* ¶ 33).  That same day, *i.e.*, June 30, 2008, Campbell informed Judge Gallipoli "that he would not resign from the bench based on his past dating relationship with Kirolos . . . ."  (*Id.* ¶ 34).  Consequently, Judge Gallipoli temporarily suspended Campbell from his position as a municipal court judge and "ordered Campbell not to return to work."  (*Id.* ¶ 38).

Subsequently, Judge Gallipoli sent correspondence to Judge Phillip Carchman ("Judge Carchman"), Administrative Director of Courts, stating that "I suggested to Judge Campbell that he . . . seriously consider resignation.  [H]e has declined . . . and has informed me that he intends to remain a judge of this court . . . I assume a complaint against Judge Campbell will be filed with the ACJC."  (*Id.* ¶ 40).  Following Judge Gallipoli's letter to Judge Carchman, the ACJC

---

[1] At the same time, Campbell served as an attorney and practiced law in the state of New Jersey.  (*Id.* ¶ 26).

[2] The ACJC is the acronym associated with the Advisory Committee on Judicial Conduct.  The Court will refer to this Committee as the ACJC.

conducted an investigation which included the interviews of Kirolos, Rebecca Mason (Assistant Court Director of the Jersey City Municipal Court), and Judge Gallipoli.  (*See id.* ¶¶ 41-46).

According to Plaintiff, Tonelli—the Executive Director of the ACJC—interviewed Judge Gallipoli on January 14, 2009.  (*Id.* ¶ 46).  During that interview, Plaintiff alleges that Judge Gallipoli "made it unequivocally clear to Tonelli that [] Gallipoli wanted Campbell off the bench . . . ."  (*Id.* ¶ 47).  For example, Judge Gallipoli stated, "I'm not so sure [Campbell] was as contrite as I would have liked him to be and . . . I thought the easy way out of this for everyone . . . was for him to resign and I put it to him that I thought he should seriously consider resigning."  (*Id.* ¶ 48).  Judge Gallipoli emphasized that "the easiest way for everyone to just get on with their life, . . . was for him to pack his bags and leave . . . ."  (*Id.* ¶ 49).  Although Gallipoli was unaware of a particular policy that prohibited judges from engaging in a consensual dating relationship with other court employees, he stated "quite frankly, you don't really need a policy that's written out . . . [i]t's not unless you are deaf, dumb, and blind that you shouldn't be doing this."  (*Id.* ¶ 50).

Campbell avers that at the time Gallipoli sought his resignation, the policy on consensual dating in the workplace began with the following statement: "[c]onsensual dating relationships between judiciary employees are generally not the Judiciary's business."  (*Id.* ¶ 57).  The policy further stated, that while dating relationships are not generally the Judiciary's business, "failure to give proper notice to the supervisor's immediate superior [of the relationship] may result in the denial of legal representation and indemnification by the State in the event that a discrimination or sexual harassment lawsuit is filed in connection with the relationship."  (*Id.* ¶ 58) (alteration in original).  To that end, Campbell contends that the policy does not

provide additional consequences for those who choose to keep relationships private, since to do so would be a violation of State privacy rights."  (*Id.* ¶ 59).[3]

However, on February 2, 2009, the ACJC—following its investigation—filed an ethics complaint against Campbell charging him with violating Canons 1 and 2A of the Code of Judicial Conduct for "engaging in an intimate relationship with a subordinate municipal court employee over whom he exercised supervisory control."  (*Id.* ¶ 65).  Plaintiff alleges that "in the history of the New Jersey Judiciary no judge had ever been charged with an ethics complaint for a consensual dating relationship with a judiciary employee."  (*Id.* ¶ 66).  Thus, Campbell contends his disparate treatment is due, in part, to his race, gender, and marital status.  (*Id.* ¶¶ 60, 62).

"In April 2009, Campbell learned of the less favorable treatment he received . . . [and] placed the State of New Jersey on notice of his intent to file suit."  (*Id.* ¶ 68).  According to Plaintiff, Judge Gallipoli, Moody, and Tonelli allegedly "delay[ed] the resolution of the ACJC complaint" after receiving notice of Campbell's intent to file suit.  (*Id.* ¶ 69).[4]

Based upon these facts, Plaintiff filed the instant Complaint on January 31, 2011, raising eleven causes of action.   (*See* Docket Entry No. 1).   In Count One, Plaintiff claims that

---

[3] Before proceeding further, the Court provides the policy in existence at the time of the events at issue:

> [c]onsensual dating relationships between judiciary employees are generally not the Judiciary's business.  *However, when the two people currently or previously involved in such relationships work as supervisor and subordinate, the supervisor must promptly inform his or her immediate superior of the personal relationship so that the Judiciary may take action to change the reporting relationship between the individuals.*  This is necessary in order to eliminate any appearance of, or actual, impropriety in the workplace.

*In the Matter of Wilson Campbell*, 205 N.J. 2, 3 (2011), *cert. denied*, 132 S. Ct. 116 (Oct. 3, 2011) (No. 10-1514) (quoting Judiciary of the State of New Jersey Policy Statement on Equal Employment opportunity, Affirmative Action, and Anti-Discrimination (July 3, 2007) (EEO Statement) (emphasis in original).

[4] To support this allegation, Campbell includes, as part of his factual allegations, a chart which details the timeline of other complaints that have been filed by the ACJC.  The Court notes that Plaintiff does not, however, provide the Court with a statute that designates a specific timeframe in which a complaint must be resolved.

Defendants violated his right to be free from unlawful race discrimination, in violation of 42 U.S.C. § 1981.  In Count Two, Plaintiff avers that Defendants engaged in a conspiracy against Campbell based on his race.  In Counts Three and Four, Judge Gallipoli is sued for alleged violations of the New Jersey Law Against Discrimination ("NJLAD").  Specifically, Plaintiff sues for discrimination in Count Three and retaliation in Count Four.  Similarly, in Counts Five and Six, Campbell sues Moody for alleged discrimination and retaliation, in violation of the NJLAD.  In Count Seven, Plaintiff alleges that Judge Gallipoli, while aided and abetted by another, unlawfully interfered with Plaintiff's prospective economic advantage.  In Count Eight, Campbell asserts a claim for "abuse of process" against Moody for utilizing the ACJC process as a mechanism to punish Campbell.  In Count Nine, Plaintiff seeks damages for intentional infliction of emotional distress.  In Count Ten, Plaintiff alleges that Moody placed Plaintiff in a false light.  Finally, in Count Eleven, Plaintiff seeks damages for Moody and Tonelli's "negligent investigation."[5]

On June 15, 2011, Defendants moved to dismiss Plaintiff's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failing to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Docket Entry No. 8).

---

[5] With respect to Count Eleven, the Court notes that neither the parties' nor this Court's independent research has yielded any federal or state law recognizing "negligent investigation" as an independent cause of action.  To the contrary, based upon the Undersigned's independent research, this Court concludes that New Jersey law does not recognize "negligent investigation" as an independent cause of action.  *See, e.g.*, *Drisco v. City of Elizabeth*, No. 03-297, 2010 U.S. Dist. LEXIS 28891, at *52 (D.N.J. Mar. 23, 2010) (Greenaway, J.) ("Because New Jersey law does not recognize 'improper investigation' as an independent cause of action . . . , Plaintiff's 'improper investigation' claim fails as a matter of law."); *Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 403 (2009) ("We are unwilling to follow the Appellate Division's lead, and thus reject the panel's creation of a new cause of action for negligent investigation").  Accordingly, Count Eleven is dismissed.

The parties have submitted their respective briefs, and the Defendants' motion is now ripe for this Court's adjudication.

## IV.    Legal Standards

### A.    Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction.  "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 191 n.4 (3d Cir. 2011) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).  In considering a Rule 12(b)(1) motion, "the district court may not presume the truthfulness of plaintiff's allegations, but rather must 'evaluat[e] for itself the merits of [the] jurisdictional claims.'" *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

### B.    Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to set forth "a short and plain statement of the claim showing that a pleader is entitled to relief."  The pleading standard announced by Rule 8 does not require detailed factual allegations; it does, however, demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal citation omitted).  In addition, the plaintiff's short and plain statement of the claim must "give the defendants fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (citing

*Twombly*, 550 U.S. at 570).  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ibid.* (internal citation omitted).   In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [and] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949.  "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached [thereto], matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2011).

"[I]f a complaint is subject to a Rule 12 (b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  *Phillips*, 515 F.3d at 245; *see also Ray v. First Nat'l Bank of Omaha*, 413 F. App'x 427, 430 (3d Cir. 2011) ("A district court should not dismiss a pro se complaint without allowing the plaintiff an opportunity to amend his complaint unless an amendment would be inequitable or futile."). Furthermore, in ruling on the present motion, the Court "must construe [Plaintiff's] complaint liberally as he is proceeding pro se."  *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 32 (3d Cir. 2011) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184 n.1 (3d Cir. 2009) ("Because Capogrosso is [an attorney], we limit our consideration of the arguments raised in her . . . brief.  Nevertheless, we remain mindful of our

obligation to construe a pro se litigant's pleadings liberally.") (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)).

With this legal framework in mind, the Court next addresses Defendants' motion.  In Part V.A., the Court addresses the immunity issues raised by each Defendant.  Next, in Part V.B., the Court determines whether the doctrines of *Rooker-Feldman*, res judicata, and collateral estoppel bar Plaintiff's claims.  Finally, in Part V.C., the Court addresses whether Plaintiff has sufficiently pleaded the causes of action raised in his Complaint.

**V.     Analysis**

   **A.     Immunity**

      **1.     The New Jersey Supreme Court**

As a preliminary matter, the Court dismisses Plaintiff's Complaint as it relates to the Supreme Court of New Jersey.  As previously stated, *Twombly* requires the Plaintiff's statement to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545.   Campbell has failed to comply with *Twombly's* pleading requirements.  Specifically, Plaintiff neither identifies nor references any wrongdoing on the part of the Supreme Court of New Jersey in any of the eleven Counts proffered in Plaintiff's Complaint.  Thus, the Supreme Court of New Jersey is left unaware of Plaintiff's claims and the grounds upon which they rest.   Therefore, Plaintiff's Complaint as it relates to the Supreme Court is dismissed.

To the extent Plaintiff chooses to file an amended complaint, he is directed to delineate the Supreme Court of New Jersey's alleged wrongdoing under each Count.  Nevertheless, the Court notes, without deciding the Eleventh Amendment immunity issue, that "while the State of New Jersey has waived its sovereign immunity to be sued [as an employer] under the NJLAD,"

- 8 -

*Rudolph v. Adamar of N.J., Inc.*, 153 F. Supp. 2d 528, 530 (D.N.J. 2000), "New Jersey has not waived its sovereign immunity with regard to suits brought in federal courts against *its court system* or its legislature." *Kwasnik v. Hon. Vincent Leblon*, No. 03-3881, 2006 U.S. Dist. LEXIS 2333, at *10, 11 (D.N.J. Jan. 23, 2006) (emphasis added); *see also Talbert v. Judiciary of the State of N.J.*, No. 09-2782, 2010 U.S. Dist. LEXIS 43789, at *9, 10 n.4 (D.N.J. May 4, 2010) ("claims brought against the Judiciary must also fail under Eleventh Amendment immunity"); *Onyiuke v. N.J. State Supreme Court*, 435 F. Supp. 2d 394, 401-02 (D.N.J. 2006) (dismissing claims against the New Jersey Supreme Court because the New Jersey Supreme Court was entitled to Eleventh Amendment immunity, and because there was no indication of an express and unequivocal waiver of immunity by the New Jersey Supreme Court); *Hawkins v. Supreme Court of N.J.*, No. 04-1317, 2005 U.S. Dist. LEXIS 37564, at *25 (D.N.J. Aug. 31, 2005) ("sovereign immunity unquestionably extends to the New Jersey Supreme Court . . . regardless of the type of relief requested") (internal citation omitted); *Hunter v. Supreme Court of N.J.*, 951 F. Supp. 1161, 1177 (D.N.J. 1996) ("The Supreme Court of New Jersey . . . enjoys Eleventh Amendment immunity . . . because the judicial branch is an integral part of the state of New Jersey.") (internal citation and quotation omitted).

### 2.      Judge Gallipoli

Before the Court analyzes the merits of the claims that have been lodged against Judge Gallipoli, the Court examines whether Judge Gallipoli is entitled to absolute judicial immunity in this action.

The Supreme Court "has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity." *Forrester v. White*, 484 U.S. 219, 227 (1988). Nevertheless, the decided cases "suggest an intelligible distinction between judicial acts and the

administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Ibid.* While recognizing the distinction, the Supreme Court has—in a long line of cases—acknowledged that "generally, a judge is immune from a suit for money damages." *Mireles v. Waco*, 502 U.S. 9, 9 (1991) (citing cases).

This general rule, however, is overcome in two sets of circumstances. *See Mireles*, 502 U.S. at 11. "First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. *Ibid.* (citing *Forrester*, 484 U.S. at 227-29; *Stump v. Sparkman*, 435 U.S. 349, 360 (1978)). "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12 (internal citations omitted). "The first question, then, is whether the identified act taken by the defendant judge was a judicial act." *Montana v. Connor*, No. 10-3635, 2011 U.S. Dist. LEXIS 107839, at *11 (D.N.J. Sept. 16, 2011) (internal quotation marks omitted). The Court answers this question by referring to two factors: "(1) whether the nature of the act itself is a judicial rather than [an] administrative or ministerial act," and "(2) whether the 'expectations of the parties' are that the judge be acting in a judicial role." *Id.* at *11, 12 (citing *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 768 (3d Cir. 2000)). The Court's task is "to 'draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges,' such as administrative acts." *Galllas*, 211 F.3d at 769 (quoting *Forrester*, 484 U.S. at 227).

In attempting to draw the line between truly judicial acts and acts that have simply been done by judges, the Court's focus remains on "the nature of the act itself." *Stump*, 435 U.S. at 362; *Forrester*, 484 U.S. at 227 ("immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches") (emphasis in original); *Gallas*, 211 F.3d at 769 ("In sum, our analysis must focus on the general nature of the challenged action"). In

focusing on the nature of the act, the Supreme Court has held that a judge's decision to terminate a court employee is not a judicial act, but an administrative one. *See Forrester*, 484 U.S. at 229. The Court reasoned that, while decisions relating to the hiring and firing of employees implicates "the efficient operation" of a court, such decisions are not themselves judicial or adjudicative because they do not implicate the adjudicative function of the court directly, and the aggrieved party—the employee—does not deal with the judge in his or her judicial capacity, but rather in an employer/employee context. *Ibid.*; *see also Montana*, 2011 U.S. Dist. LEXIS 107839, at *12 ("[A] judge's decision to terminate a court employee is not a judicial act . . . because it does not implicate the adjudicative function of the court directly and the aggrieved party (employee) does not deal with the judge in a judicial capacity, but in an employer/employee capacity."); *Watkins v. Blocker*, No. 06-3775, 2007 U.S. Dist. LEXIS 18149, at *12 (E.D. Pa. Mar. 15, 2007) ("Acts involved in supervising court employees and overseeing the efficient operation of a court may be important to a sound adjudicative system, but they are not themselves judicial or adjudicative.") (internal quotation marks omitted).  Conversely, examples of actions that have been considered judicial in nature include, *inter alia*, issuing a ruling while presiding over a judicial proceeding, *see Melleady v. Blake*, No. 11-1807, 2011 U.S. Dist. LEXIS 144834, at *23 (D.N.J. Dec. 15, 2011); issuing various orders in connection with matters pending before the court, *see Gage v. Warren Twp. Comm. and Planning Bd. Members*, No. 11-1501, 2011 U.S. Dist. LEXIS 137134, at *25 (D.N.J. Nov. 29, 2011); controlling a courtroom by barring a juvenile-family crisis counselor from appearing before the court, s*ee Montana*, 2011 U.S. 107839, at *19; issuing a search warrant, *see Burns v. Reed*, 500 U.S. 478, 486 (1991); directing court officers to bring a person who is in the courthouse before the judge for a judicial proceeding, *see Mireles*, 502 U.S. at 12-13; granting a petition for sterilization, *see Stump*, 435 U.S. at 362-64; and disbarring an

attorney as a sanction for the attorney's contumacious conduct. *See Bardley v. Fisher*, 80 U.S. 335, 354-57 (1872).

"With respect to the second inquiry, we must distinguish between acts in the 'clear absence of all jurisdiction,' which do not enjoy the protection of absolute immunity, and acts merely in 'excess of jurisdiction,' which do enjoy that protection[.]" *Gallas*, 211 F.3d at 769. "Even when a judge violates a rule of court procedure by taking the action, so long as the judge had general subject matter jurisdiction over the action, the act is not stripped of its judicial immunity." *Montana*, 2011 U.S. Dist. LEXIS 107839, at *13 (citing *Gallas*, 211 F.3d at 769).

In addition, "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in the excess of authority . . . ." *Stump*, 435 U.S. at 356-57 (internal citation omitted). Immunity will not be forfeited because the judge committed "grave procedural errors," *id.* at 359, or because a judge has conducted a proceeding in an "informal and *ex parte*" manner. *Forrester*, 484 U.S. at 227. "Further, immunity will not be lost merely because the judge's action is 'unfair' or controversial." *Gallas*, 211 F.3d at 769 (citing *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985)).

With these principles in mind, the Court next turns to the parties' arguments. Judge Gallipoli contends that he is entitled to judicial immunity for the following reasons: (1) "all of [his] actions were taken as part of his oversight role as the Assignment Judge of the Hudson Vicinage," and thus are "judicial duties" (Defs. Moving Br. at 19); and (2) he "acted within the scope of his duties at every step of his involvement with plaintiff [sic]." (*Ibid.*). Campbell, in opposition, argues that judicial immunity is not applicable because "[h]ere, Judge Gallipoli acted as a supervisor in an employment capacity and not as a judge in a judicial capacity." (Pl. Opp. Br. at 12).

- 12 -

The Court finds that Plaintiff has the better of the argument for the following two reasons. First, the law is clear: judges are not entitled to absolute judicial immunity for their decisions to terminate an employee. *Forrester*, 484 U.S. at 230. In *Forrester*, the United States Supreme Court concluded that those types of decisions were not "judicial or adjudicative" because they "involved [] supervising court employees and overseeing the efficient operation of a court." *Forrester*, 484 U.S. at 229-30; *see also Montana*, 2011 U.S. Dist. LEXIS 107839, at *12 ("[A] judge's decision to terminate a court employee is not a judicial act, but an administrative one.") (citing *Forrester*, 484 U.S. at 229). *Forrester's* holding and rationale are applicable here where the conduct at issue directly relates to a judge's decision to discharge an employee. And while Judge Gallipoli argues that his conduct was judicial in nature because his "actions were taken as part of his oversight role . . . as he was responsibl[e] for the administration of all courts [in Hudson County]," (Defs. Opp. Br. at 19, 20), that argument cannot withstand this Court's scrutiny in light of *Forrester*. Indeed, *Forrester* unequivocally rejected that argument, holding that "supervising court employees and overseeing the efficient operation of a court" are neither "judicial [n]or adjudicative" acts.[6] *Forrester*, 484 U.S. at 229; *see also Watkins*, 2007 U.S. Dist. LEXIS 18149, at *14 ("Supervisory decisions regarding how courts function are adjudicative."). Therefore, the Court finds Judge Gallipoli's decision to temporarily suspend Campbell, accompanied by his request that Campbell "pack his bags and leave," to be an administrative act.

---

[6] Judge Gallipoli seeks to bolster his position that his action here was judicial by citing to *Duffy v. Armstrong*, No. A-1285-07T1, 2010 N.J. Super. Unpub. LEXIS 734 (App. Div. Apr. 8, 2010). The Court is not persuaded. In *Duffy*, the court found that the Assignment Judge was acting in her judicial capacity specifically because her letter responses to Duffy "were made to directly address Duffy's concerns for his and his client's well being *in the context of a particular action then pending* in the municipal court." *Id.* at 37. Unlike Judge Armstrong's actions in *Duffy*, Judge Gallipoli's actions here were not taken in the context of a particular matter pending before the Court. As explained above, and acknowledged by Defendant, Judge Gallipoli's actions were taken as a result of his oversight and administrative responsibilities without regard to any pending action.

Additionally, the Court finds that, under the "expectation of the parties" inquiry, Campbell dealt with Judge Gallipoli in an administrative capacity. Specifically, as the *Montana* court noted, "even though a judge's decisions regarding the hiring and firing of employees implicates the efficient operation of a court, . . . *the aggrieved party (employee) does not deal with the judge in a judicial capacity but rather in an employer/employee capacity*." 2011 U.S. Dist. LEXIS 107839, at *12 (citing *Forrester*, 484 U.S. at 229) (emphasis added). Thus, in this case, where the acts at issue relate to Judge Gallipoli's decision to temporarily suspend Campbell—the aggrieved party—from his position as a municipal court judge, Campbell dealt with Judge Gallipoli in an employee/employer capacity and not in a judicial capacity.

Second, the reasons set forth by the Supreme Court in recognizing judicial immunity are not implicated here. The Supreme Court has explained that:

> [t]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires . . . [and] [i]f judges were personally liable for erroneous decisions, the resulting avalanche of suits . . . would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. . . resulting [in] timidity [which] would be hard to detect or control . . . from independent and impartial adjudication.

*Gallas*, 211 F.3d at 768 (quoting *Forrester*, 484 U.S. at 226-27). As the *Forrester* Court most eloquently opined, "[a]bsolute immunity . . . is strong medicine, justified only when the danger of [officials being] deflect[ed from the performance of their duties] is very great." 484 U.S. at 230 (internal citation omitted). In this case, the Supreme Court's concerns underlying the extension of judicial immunity are not warranted. That is, the nature of Judge Gallipoli's act here was not adjudicative in nature. Thus, the concerns of timidity in rendering judicial decisions and independent and impartial adjudication are not piqued.

- 14 -

In light of the above, this Court concludes that Judge Gallipoli's actions were not taken in his judicial capacity. Furthermore, the rationale underlying the extension of this immunity are not implicated here. Therefore, Judge Gallipoli is not entitled to absolute judicial immunity.[7]

### 3.  The ACJC Defendants—Moody and Tonelli

Moody and Tonelli also claim to be immune from suit, and raise three arguments in support of that position. First, they declare to be entitled to absolute immunity for their job related actions pursuant to R. 2:15-22(a). (Defs. Moving Br. at 22-24). Second, Moody and Tonelli assert that they are entitled to quasi-judicial immunity. (*Id.* at 24). Finally, Moody and Tonelli claim to be entitled to prosecutorial immunity. (*Ibid.*). Although the Court finds that Moody and Tonelli are immune from suit under R. 2:15-22(a), the Court addresses each argument below.[8]

### i.  Immunity Under Rule 2:15-22(a)

Rule 2:15-22(a) is clear: "[t]he members and staff of the [Advisory] Committee on Judicial Conduct shall be absolutely immune from suit, whether legal or equitable in nature, for any conduct in the performance of their official duties."

Despite the clarity of this rule, Campbell contends that Moody and Tonelli acted as "personal prosecutors for Judge Gallipoli" during the institution of Campbell's disciplinary proceedings, and "selective[ly] prosecuted" him thereby acting without jurisdiction. (Pl. Opp. Br. at 12). By contrast, Moody and Tonelli argue that their "actions were well within their duties

---

[7] Having determined that absolute judicial immunity is not applicable under the first exception, the Court need not address the second exception.

[8] As an initial matter, the Court notes that Moody and Tonelli are sued in their individual capacities. Individual or "[p]ersonal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Hunter v. Supreme Court of N.J.*, 951 F. Supp. 1161, 1178 (D.N.J. 1996).

. . . and only came about as a result of plaintiff's [sic] reported misconduct."  (Defs. Moving Br. at 23).

In light of the unambiguous language of R. 2:15-22(a), in conjunction with Defendants' alleged unlawful conduct, the Court holds that Moody and Tonelli are immune from suit for the following reasons.  First, both Moody and Tonelli are staff members of the ACJC.  Defendant Moody is Disciplinary Counsel to the ACJC and is authorized to "file formal disciplinary charges against all judges in the State of New Jersey."  (Compl. ¶ 14).  Defendant Tonelli is the Executive Director of the ACJC.  In this capacity, his responsibilities include, *inter alia*, "supervis[ing] Moody, investigating complaints against judges, and aid[ing] Moody in the filing of ethics complaints."  (*Id.* ¶15).

Second, in light of Defendants' roles within the ACJC, as well as their responsibilities related thereto, Plaintiff's allegations against Moody and Tonelli arise out of conduct that occurred in the performance of their official duties.  For example, allegations of judicial misconduct were reported to the ACJC.  "The ACJC [then] conducted an investigation in[to] the matter and interviewed . . . three witnesses."  (*Id.* ¶ 41).  Following this investigation, Moody filed an ethics complaint against Campbell.  (*Id.* ¶ 5).  This conduct—investigating complaints of judicial misconduct, instituting formal proceedings, and prosecuting the allegations of judicial misconduct—encapsulates the essential functions of the ACJC and is permitted by the New Jersey Court rules.  As the Court in *Hunter* explained, "[e]ssentially, the function of the ACJC is to investigate complaints of judicial misconduct, and either dismiss them or institute formal proceedings against the judge."  951 F. Supp. at 1164.

Having thoroughly considered the allegations raised in Plaintiff's complaint, the Court finds that the unambiguous language of R. 2:15-22(a) is triggered.  Specifically, "members and

- 16 -

staff of the [Advisory] Committee on Judicial Conduct shall be absolutely immune from suit . . . for *any conduct in the performance of their official duties*."  (emphasis added).  The conduct at issue here arises out of the performance of Moody and Tonelli's official duties.  Accordingly, Moody and Tonelli are immune from suit pursuant to R. 2:15-22(a).[9]

### ii.    Quasi-Judicial Immunity

Defendants Moody and Tonelli next claim that they are entitled to quasi-judicial immunity for their actions because they "arise out of their official duties in processing judicial ethics grievances and complaints on behalf of the Supreme Court of New Jersey."  (Defs. Moving Br. at 24).  Thus, the Court considers whether Moody and Tonelli can be cloaked in the veil of quasi-judicial immunity.

"[T]he protections of judicial immunity extend to officials who perform quasi-judicial functions."  *Wicks v. Lycoming Cnty.*, No. 11-1808, 2012 U.S. App. LEXIS 258, at *7 (3d Cir. Jan. 5, 2012) (citing *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 772 (3d Cir. 2000)) (internal quotation marks omitted).  To that end, "[a]bsolute immunity [or quasi-judicial immunity] does not apply in every action . . . ; [r]ather, 'it [is] the nature of the function performed, not the identity of the actor who performed it, that informs[] [an] immunity analysis.'"  *Kwasnik v. Leblon*, 228 F. App'x 238, 243 (3d Cir. 2007), *cert. denied*, 128 S. Ct. 451 (Oct. 9, 2007) (No. 07-6069) (quoting *Forrester*, 484 U.S. at 229) (alteration in original).  "'When judicial immunity is extended to officials other than judges, it is because their judgments are functional[ly]

---

[9] Campbell's reliance on *Harris v. Harvey*, 605 F.3d 330 (7th Cir. 1979) is misplaced.  In *Harris*, immunity was not available for a judge and prosecutor who, without probable cause, commenced secret John Doe proceedings to incriminate the plaintiff; issued invalid warrants for plaintiff's arrest, which the defendant judge read over a public radio station; prepared and issued a press release containing false information relating to plaintiff; and allegedly met with officials of the Wisconsin Attorney General's Office threatening to accuse plaintiff of bribery, ticket-fixing, and other illegal activities in the public press unless the Attorney General took action against the plaintiff.  Thus, the conduct at issue before the Seventh Circuit in *Harris* is far removed from the factual scenario presented here.

comparab[le] to those of judges—that is, because they, too, exercise a discretionary judgment as a part of their function.'" *Id.* at 244 (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993)) (internal quotation marks omitted) (alteration in original).

In determining whether quasi-judicial immunity should be extended to Moody and Tonelli, the Court finds the Third Circuit's decision in *Kwasnik* persuasive. In *Kwasnik*, plaintiff filed a civil rights complaint against several entities seeking damages and injunctive relief after losing joint custody of his son during custody proceedings. (*See Kwasnik v. Leblon*, Docket No. 03-3881 (SRC), Complaint, Docket Entry No. 1). The members of the ACJC were among the defendants from whom Kwasnik sought relief. Specifically, Kwasnik alleged that he was denied due process when the members of the ACJC denied his first judicial complaint and failed to rule on his second misconduct complaint both of which were filed against Judge Leblon—the superior court judge who ruled against him during his child custody proceeding. *Kwasnik*, 228 F. App'x at 243. In deciding whether the members of the ACJC enjoyed quasi-judicial immunity, the Third Circuit looked to the nature of the function, and held that members of the ACJC were entitled to quasi-judicial immunity because the "acts complained of [were] the *kind of discretionary acts* normally performed by a judge." *Id.* at 244 (emphasis added); *see also Capogrosso*, 588 F.3d 180, at 185 ("To the extent that Capogrosso's pro se complaint can be read to include claims against Director Tonelli and Disciplinary Counsel Moody in their individual capacities, they are entitled to quasi-judicial immunity").

The facts alleged here are similar to those presented to the Third Circuit in *Kwasnik*. Thus, guided by the Third Circuit's decision in *Kwasnik*, this Court looks to the nature of the function performed by Moody and Tonelli. In this case, Campbell alleges that the ACJC has unfettered discretion in determining which complaints to file, (Compl. ¶ 20), and filed an ethics

- 18 -

complaint against him.  Campbell complains, however, because "no judge had ever been charged with an ethics complaint for a consensual dating relationship with a judiciary employee . . . ." (*Id.* ¶ 66).  Notwithstanding Plaintiff's arguments, these acts, *i.e.*, determining whether to file an ethics complaint against Campbell following an investigation, are discretionary acts normally performed by judges because they are decisions which involve the exercise of discretionary judgment.  Accordingly, Moody and Tonelli enjoy quasi-judicial immunity from suit.[10]

> **B.**     **The *Rooker-Feldman* Doctrine, Res Judicata, and Collateral Estoppel**
>
> **1.**     **Application of the *Rooker-Feldman* Doctrine**

"The *Rooker-Feldman* doctrine deprives a federal district court of jurisdiction in some circumstances to review a state court adjudication."  *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 547 (3d Cir. 2006).  The doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced [thereby] inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  Pursuant to the doctrine, "federal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'"  *Blake v. Papadakos*, 953 F.2d 68, 71 (3d Cir. 1992) (quoting *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483 n.16 (1983).  "When, however, a federal plaintiff asserts injury caused by the defendant's actions and not by the state-court judgment, *Rooker-Feldman* is not a bar to federal

---

[10] To the extent that Campbell seeks to characterize Moody and Tonelli's actions as prosecutorial in nature, Moody and Tonelli would be protected by prosecutorial immunity.  *See Kwasnik*, 228 F. App'x at 244 ("To the extent that th[e Advisory Committee members] actions are prosecutorial in nature, the Committee members are protected by prosecutorial immunity.") (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)).

jurisdiction." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 167 (3d Cir. 2010); *see also Dukes v. Lancer Ins. Co.*, 390 F. App'x 159, 161-62 (3d Cir. 2010) ("In this case, Duke's complaint alleges injury stemming from [defendant's] conduct, not from the New Jersey Superior Court's judgment.  Accordingly, we cannot conclude that this case is barred by *Rooker-Feldman*.").

Defendant argues that Plaintiff's attempt to relitigate injuries he allegedly suffered as a result of his prior disciplinary action is precluded under the *Rooker-Feldman* Doctrine.  (Defs. Moving Br. at 16).   Conversely, Plaintiff contends that the "administrative disciplinary proceedings . . . were not initiated to determine whether defendants [sic] engaged in unlawful discrimination against Campbell."  (Pl. Opp. Br. at 9).  Plaintiff further asserts that his federal lawsuit "does not seek to overturn the reprimand imposed against him by the New Jersey Supreme Court.  Rather, "[Plaintiff's] suit seeks redress for unlawful discrimination perpetrated by Judge Gallipoli, Tonelli and Moody . . . [for] punish[ing] Campbell for engaging in a consensual dating relationship . . . ."  (*Ibid.*).

Having thoroughly reviewed Plaintiff's Complaint, and the allegations contained therein, the Court finds that Plaintiff has the better of the argument for the following two reasons.  First, Plaintiff does not complain of a state court *judgment* which predates Campbell's federal suit.  *See Exxon Mobil Corp.*, 544 U.S. at 284 (emphasis added).   Instead, Plaintiff complains of *Judge Gallipoli's conduct* in seeking Campbell's resignation.  (emphasis added).  Second, Campbell neither requests review of the final adjudication of his disciplinary proceeding, nor does Plaintiff ask this Court to evaluate constitutional claims that are inextricably intertwined with the New

Jersey Supreme Court's prior decision.[11]  *See Blake*, 953 F.2d at 71.  Rather, Plaintiff's federal complaint seeks redress for alleged violations of equal protection, conspiracy, NJLAD, retaliation, unlawful interference with prospective economic advantage, and intentional infliction of emotional distress.  Thus, Campbell asserts injury caused by the Defendant's actions and not by the judgment rendered as a result of his disciplinary proceedings.  Consequently, *Rooker-Feldman* does not divest this Court of its jurisdiction.  *See Great Western Mining & Mineral Co.*, 615 F.3d at 167; *see also Dukes*, 390 F. App'x at 161-62.

### 2.    Application of Res Judicata

Defendant next argues that "[e]ven if *Rooker Feldman* does not act as a bar to claims [sic], res judicata . . . would apply as plaintiff [sic] is attempting to relitigate issues previously determined by the Supreme Court of New Jersey."  (Defs. Moving Br. at 17).

"Claim preclusion, or res judicata, is a defense asserted when a case is *essentially identical* to one that has previously been adjudicated."  *R&J Holding Co. v. Redevelopment Auth.*, No. 10-1047, 2011 U.S. App. LEXIS 24406, at *11 (3d Cir. Dec. 9, 2011) (emphasis added).  This doctrine "bars not only claims that were brought in a previous action, but also claims that could have been brought."  *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008) (citing *Post v. Hartford Ins. Co.*, 501 F.3d 154, 169 (3d Cir. 2007)).  "It protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy . . . and promotes

---

[11]  The Court does not, however, address any of Plaintiff's arguments relating to the following matters: (1) consensual dating relationships were permitted under the Judiciary of the State of New Jersey Policy Statement on Equal Employment Opportunity; (2) that Campbell was required to report his relationship with Kirolos as he was her supervisor; and (3) that Moody and Tonelli sought to punish Campbell for a "protected right, namely the right to privacy and the right as an adult to engage in an intimate relationship," (Pl. Opp. Br. at 12), as these arguments were either raised during Campbell's disciplinary proceedings or are inextricably intertwined with the New Jersey Supreme Court's decision which reprimanded Campbell for violations of Canon 1 and Canon 2A of the Code of Judicial Conduct.  (*See* Document Entry No. 8-3); *see also In re Campbell*, 205 N.J. 2 (2011), *cert. denied*, 132 S. Ct. 116 (Oct. 3, 2011) (No. 10-1514).  The Court may consider these documents as they are part of the public record. *See Mayer*, 605 F.3d at 230.

judicial economy by preventing needless litigation." *Ibid.* (internal citation and quotation marks omitted) (alteration in original).  A claim shall be precluded, *i.e.*, the doctrine of res judicata will apply, when three conditions are present: "'(1) a final judgment on the merits in a prior suit involving (2) the  same parties or their privies and (3) a subsequent suit based on the same cause of action.'" *Ibid.* (quoting *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991)).

The Court finds that the doctrine of res judicata is inapplicable for the following two reasons.   First, the Court finds Defendant's assertion of this doctrine wanting because Campbell's federal case is *not essentially identical* to the case that was previously litigated.  *See R&J Holding Co.*, 2011 U.S. App. LEXIS 24406, at *11.  Namely, the prior case—Campbell's disciplinary proceeding—involved, and was grounded in, allegations of judicial misconduct, which stemmed from Campbell's failure to report a consensual dating relationship with his bailiff.  By contrast, the basis or impetus of Plaintiff's federal action is the alleged unlawful discrimination implemented by Judge Gallipoli.  The distinction is fine, but nevertheless the cases are not essentially identical.   Therefore, Plaintiff's federal complaint is not based on the very same claim at issue in the prior proceeding.  *See N.H. v. Me.*, 532 U.S. 742, 748 (2001) (Under the doctrine of claim preclusion, a final judgment bars "successive litigation of the *very same claim*, whether or not relitigation of the claims raises the same issues as the earlier suit.") (emphasis added).  Finally, Plaintiff's federal claims were not raised in the prior proceeding, and thus the concern of needless relitigation is misplaced.   *In re Mullarkey*, 536 F.3d at 225. Accordingly, the doctrine of res judicata does not bar Plaintiff's claims.

### 3.    Application of Collateral Estoppel

Defendant claims that "[t]he issue of Campbell's failure to report his relationship with his Bailiff [sic] is the identical issue presented in his federal complaint," and for that reason,

"collateral estoppel operates to preclude the issue[s] [raised in Campbell's federal complaint]." (Defs. Moving Br. at 18-19).

"[C]ollateral estoppel is an equitable doctrine invoked in the exercise of a court's sound discretion." *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 521 (2006). Collateral estoppel provides that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247 (3d Cir. 2010) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). Under New Jersey law, it is well settled that a party asserting collateral estoppel to foreclose the relitigation of an issue, must establish the existence of five conditions: "(1) the issue to be precluded is identical to the issue to be decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." *Olivieri*, 186 N.J. at 521 (internal citation omitted); *see Zoneraich v. Overlook Hosp.*, 212 N.J. Super. 83, 93-94 (App. Div. 1986) ("A party is . . . collateral[ly] estoppe[d] from relitigating matters or facts which the party actually litigated and which were determined in a prior action, . . . and which were directly in issue between the parties."); *accord* Restatement (Second) of Judgments § 27 (1982) ("Issue Preclusion—General Rule: When an issue of fact or law is actually litigated and determined by a valid and final judgment, and he determination is essential to the judgment, the determination s conclusive in a subsequent action between the parties, whether on the same or different claim."). However, "[e]ven where these

- 23 -

requirements are met, the doctrine . . . will not be applied when it [would be] unfair to do so." *Pace v. Kuchinsky*, 347 N.J. Super. 202, 215 (App. Div. 2002).

The Court finds that Defendants have failed to establish the first and second conditions enumerated in *Olivieri*, *i.e.*, that the issue to be precluded here is identical to the issue decided in the prior proceeding, and that the issue was actually litigated in the prior proceeding. The issue determined by the ACJC—and subsequently affirmed by the New Jersey Supreme Court—was whether Campbell violated the Code of Judicial Conduct by failing to report a consensual romantic relationship with his assigned bailiff. *See In re Campbell*, 205 N.J. 2 (2011). The issues presented here are unmistakably distinct from the issues presented in the earlier disciplinary suit. Specifically, the issues this Court must grapple with involve allegations of unlawful discrimination based upon race, sex, and marital status, civil conspiracy, retaliation, unlawful interference with prospective economic advantage, and intentional infliction of emotional distress. Logically, therefore, these issues were not actually litigated in the prior proceeding. Accordingly, this Court declines to apply the doctrine of collateral estoppel.

### C.      Analysis of Plaintiff's Causes of Action[12]

#### 1.      Equal Protection—Count One

In Count One, Plaintiff seeks relief under 42 U.S.C. § 1981. Plaintiff avers that "Defendants . . . violated his right to be free from unlawful race discrimination by state action." (Compl. ¶ 105). Judge Gallipoli argues that Campbell cannot proceed under 42 U.S.C. § 1981 because "the exclusive federal remedy for violation [sic] of rights by state actors under [Section]

---

[12] Having determined that Moody and Tonelli are immune from suit, the Court does not address Count Five (Discrimination by Moody), Count Six (Retaliation by Moody), Count Eight (Abuse of Process by Moody), and Count Ten (False Light in the Public's Eye caused by Moody). To the extent that Plaintiff merely references all "Defendants" under a particular Count, the Court analyzes whether Plaintiff has stated a claim upon which relief can be granted against Judge Gallipoli—*i.e.*, the Defendant not immune from suit.

1981 is contained in 42 U.S.C. § 1983." (Defs. Moving Br. at 25). The Court, in turn, must decide whether Campbell has stated a claim to relief that is plausible on its face. *Iqbal*, 129 S. Ct. at 1949.

The law in the Third Circuit is clear: "[n]o private right of action lies against a state actor under § 1981." *Ford v. SEPTA*, 374 F. App'x 325, 326 (3d Cir. 2010) (internal citation omitted). This is so, however, because "in promulgating § 1983 over a century ago, [Congress] established that section as the exclusive remedy for violations of § 1981 by state actors." *McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009). Thus, "while § 1981 creates *rights*, § 1983 provides the *remedy* to enforce those rights against state actors." *McGovern*, 554 F.3d at 116 (emphasis in original); *see also Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 723, 735 (1989) (holding that the exclusive federal remedy against state actors for violation of rights guaranteed in § 1981 is 42 U.S.C. § 1983).

In this case, Campbell concedes that he seeks to utilize § 1981 as a vehicle to remedy alleged "unlawful race discrimination by state act[ors]." (Compl. ¶ 105). To that end, Count One of Plaintiff's Complaint fails to state a valid claim upon which relief can be granted because, as noted above, § 1981 *creates rights*, and § 1983 provides the *exclusive remedy* to *enforce those rights* against state actors. *See Ford*, 374 F. App'x at 326 (holding that the district court's dismissal of plaintiff's § 1981 claim was proper because "[t]he exclusive remedy for relief from a state agency for civil rights violations, including race discrimination, is § 1983"); *Roper v. Van Mater*, No. 10-2229, 2011 U.S. Dist. LEXIS 131465, at *6, 7 (D.N.J. Nov. 15, 2011) (dismissing count one of plaintiff's second amended complaint because it was brought directly under § 1981); *A v. Gloucester Twp.*, 2011 U.S. Dist. LEXIS 79515, at *13, 14 (D.N.J. July 21, 2011) (dismissing count two of plaintiff's amended complaint because § 1983

constitutes the exclusive federal remedy for a violation of rights guaranteed in § 1981 by state governmental units); *Bibbs v. Twp. of Kearney*, No. 09-3769, 2011 U.S. Dist. LEXIS 18837, at *11 (D.N.J. Feb. 25, 2011) (dismissing count one of plaintiff's complaint for failing to state a valid claim "because § 1981 claims are not cognizable against state actors"); *Clark v. Winslow Twp. of Bd. of Ed.*, No. 10-4342, 2011 U.S. Dist. LEXIS 12981, at *7, 8 (D.N.J. Feb. 9, 2011) (dismissing § 1981 claims because a private right of action against state actors cannot be implied under § 1981). Accordingly, Count One of Campbell's Complaint is dismissed.

### 2. Conspiracy, 42 U.S.C. § 1985—Count Two

The Court next determines whether Plaintiff has alleged sufficient facts to state a *prima facie* claim for conspiracy.[13]

"Section 1985(3) permits an action to be brought by one injured by a conspiracy formed for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Estate of Oliva v. N.J. Dep't of Law & Pub. Safety, Div. of State Police*, 604 F.3d 788, 802 (3d Cir. 2010) (internal citation and quotation marks omitted). To state a claim under § 1985(3), a plaintiff must allege "'(1) a conspiracy; (2) for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; [] (3) an act in furtherance of the conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Slater v. Susquehanna Cnty.*, No. 11-1726, 2012 U.S. App. LEXIS 406, at *8 (3d Cir. Jan. 9, 2012) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)).

---

[13] Although Campbell does not specify which section of 42 U.S.C. §1985 he seeks relief under, the Court finds that based upon the allegations contained in his Complaint, as well as the case cited in his opposition—*Brown v. Phillip Morris, Inc.*, 250 F.3d 789 (3d Cir. 2001)—Plaintiff seeks relief under 42 U.S.C. §1985(3).

To survive a Rule 12(b)(6) motion to dismiss, allegations of a conspiracy must provide "some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009). "As the linchpin for conspiracy is agreement, . . . concerted action, without more, cannot suffice to state a conspiracy claim." *Watson v. Sec'y Pa. Dep't of Corr.*, 436 F. App'x 131, at *16 (3d Cir. 2011). Further, the "second component of the test requires the plaintiff to allege that the conspiracy was motivated by racial, gender, or other class-based discriminatory animus." *Slater*, 2012 U.S. App. LEXIS 406, at *8 (citing *Farber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006)).

Judge Gallipoli seeks dismissal of Count Two of Campbell's Complaint for two reasons. First, "Plaintiff's complaint [sic] cannot cite any conduct . . . as evidence of a conspiracy . . . ." (Defs. Moving Br. at 29). Second, "[t]here is no nexus between plaintiff's [sic] race and the actions that were taken in this matter." (*Ibid.*).

Conversely, Plaintiff contends that he has alleged sufficient facts to establish a *prima facie* case of conspiracy. Having reviewed Plaintiff's Complaint, the Court extracts the following relevant allegations: (1) when Campbell informed Judge Gallipoli that he would not resign, Judge Gallipoli contacted Judge Carchman and stated, "anticipating Judge Campbell will not resign, I think at the very least a suspension is called for pending a full investigation" (Compl. ¶ 37); (2) Judge Gallipoli treated Campbell's matter differently, due in part to his race (*id.* ¶ 62); (3) the ACJC treated Campbell differently based on his race when it did not interview him (*id.* ¶¶ 63, 86); (4) Judge Gallipoli, Moody, and Tonelli acted in concert to intentionally delay the resolution of the ACJC complaint (*id.* ¶ 69); and (5) the concerted actions of the Defendants violated Campbell's right to be free from unlawful discrimination. (*Id.* ¶ 110).

The Court finds that Plaintiff has failed to properly allege sufficient facts that would support the first element of the test announced above, *i.e.*, a conspiracy.  To properly plead the existence of a conspiracy, Campbell must be able to prove an "*actual agreement between the parties . . . [and] concerted action*."  *Watson*, 436 F. App'x at 137; *see also Capogrosso*, 588 F.3d at 184 ("The rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: *agreement and concerted action*.  A conspiracy cannot be found from allegations of judicial error, ex parte communications . . . [,] or adverse rulings absent specific facts demonstrating an agreement to commit the alleged improper actions.") (emphasis added); *Demetro*, 2011 U.S. Dist. LEXIS 134636, at *47 ("To survive a Rule 12(b)(6) motion to dismiss, allegations of conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.") (internal citation and quotation marks omitted).  While Campbell alleges that the concerted efforts of the state actors violated his right to be free from unlawful race discrimination, (Compl. ¶ 110), Campbell does not allege that these parties entered into an agreement to violate his rights.  Specifically, Campbell fails to plead any facts that would plausibly suggest a meeting of the minds between Judge Gallipoli, Moody, and Tonelli.  As the Third Circuit held in *Watson*, "[because] the linchpin for conspiracy is *agreement*, . . . concerted action, without more, cannot suffice to state a conspiracy claim."  436 F. App'x at 137 (emphasis added) (citing *Twombly*, 550 U.S. at 553-54).  Therefore, the facts alleged, without more, do not create plausible grounds for a successful conspiracy claim under 42 U.S.C. § 1985.  Accordingly, Count Two of Plaintiff's Complaint will be dismissed.[14]

---

[14] The Court notes that at most Plaintiff's allegations suggest an *ex parte* communication between Judge Gallipoli and Judge Carchman, which cannot form the basis of a conspiracy claim.  *See Capogrosso*, 588 F.3d at 184.

### 3.      Discrimination—Count Three

Plaintiff contends that Judge Gallipoli "compelled adverse action against Campbell due in part to Campbell's race, sex, or marital status."  (Compl. ¶ 115).  As a preliminary matter, the NJLAD, specifically, "N.J.S.A. 10:5-1 to -42, prohibits discrimination because of race, . . . sex, . . . or . . . marital status."  *Taylor v. Metzger*, 152 N.J. 490, 498 (1998) (internal citation and quotation marks omitted).  Furthermore, "The [NJ]LAD [is to] be construed liberally and . . . [i]ts purpose is nothing less than the eradication of the cancer of discrimination."  *Anderson v. Cnty. of Salem*, No. 09-4718, 2010 U.S. Dist. LEXIS 79119, at *31 (D.N.J. Aug. 5, 2010) (internal citations and quotation marks omitted).  With these preliminary principles in mind, the Court next addresses Plaintiff's allegations of unlawful discrimination.

### a.      Claim of Racial Discrimination

The Court first determines whether Plaintiff has sufficiently alleged a cause of action under the NJLAD for racial discrimination.

"Discrimination claims brought under . . . NJLAD must be analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)."  *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 493 (3d Cir. 1999)) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim.").  The framework is comprised of three steps.  "First, a plaintiff must present sufficient evidence to support a *prima facie* case of discrimination."  *Ibid.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 506).  To establish a *prima facie* case of discrimination, the plaintiff must prove (1) that he belongs to a protected class; (2) that he was qualified for the position; (3)

- 29 -

that he suffered an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *See ibid.* (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 1286, 1296-97 (3d Cir. 1999)); *see also Hatcher v. Family Dollar Store, Inc.*, No. 08-1444, 2010 U.S. Dist. LEXIS 29211, at *37, 38 (D.N.J. Mar. 26, 2010) (citing *Kimble v. Morgan Props.*, 241 F. App'x 895, 897-98 (3d Cir. 2007)) ("The elements of a *prima facie* case of racial discrimination are that (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for the position Plaintiff held; (3) Plaintiff suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably OR the circumstances of Plaintiff's termination give rise to an inference of discrimination."). "Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who [at step two] must articulate a legitimate, nondiscriminatory reason for its actions." *Ibid.* (internal citation omitted). Should the defendant satisfy this burden, the reviewing court proceeds to step three. At step three, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not the true reason for the employment decision, but was merely a pretext for discrimination." *Ibid.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507-08).

### i.     Step One

The Court is satisfied that Campbell—at step one—has established a *prima facie* case of racial discrimination for the following reasons. First, it cannot be disputed that Campbell is a member of a protected class, as he is an African American. *See Rogers v. Alt. Res. Corp.*, 440 F. Supp. 2d 366, 371 (D.N.J. 2006) ("Rogers is a member of a protected class, as he is an African American."); *Thomas v. UPS*, No. 07-5607, 2010 U.S. Dist. LEXIS 94039, at *9 (D.N.J. Sept. 9, 2010) ("It is undisputed that [p]laintiff [an African American] is a member of a protected

- 30 -

class."). Second, the Court finds that Campbell was qualified to be a municipal court judge in Jersey City, New Jersey. Indeed, Judge Gallipoli does not argue that Campbell lacked the capacity to serve as a part-time municipal court judge. Nor does Judge Gallipoli raise any issue with respect to Plaintiff's competency while serving as a judge from October 2007 until his temporary suspension on June 30, 2008. Thus, the second element is satisfied.

Third, Campbell has alleged that he suffered an adverse employment action. Specifically, Campbell alleges that on "June 30, 2008 Judge Gallipoli temporarily suspended Campbell from his position as a municipal court judge when Judge Gallipoli ordered Campbell not to return to work." (Compl. ¶ 38); (*see also id.* ¶ 113) ("Judge Gallipoli attempted to force Campbell . . . to resign from his position as a municipal court judge"). To that end, Plaintiff has established the third element of the analysis for racial discrimination—Plaintiff suffered an adverse employment action.

Finally, Campbell has provided sufficient facts giving rise to an inference that the adverse employment action resulted from discrimination. Specifically, Plaintiff alleges that "in the history of the New Jersey Judiciary no judge had ever been charged with an ethics complaint for a consensual dating relationship with a judiciary employee . . . even though a number of other judges had engaged in such relationships." (*Id.* ¶ 66). Campbell also provided testimony elicited from Judge Gallipoli during his ACJC interview, wherein despite being presented with a similar occurrence, Judge Gallipoli did not "for a lot of different reasons . . . suggest that the [other] person resign." (*Id.* ¶ 61). To demonstrate the alleged disparate treatment between Campbell and the other judge whose resignation was not requested, Plaintiff provides the Court with a chart titled "Diagrams of Discrimination by Judge Gallipoli," of which the Court extracts the following relevant information: (1) the judge who Judge Gallipoli did not request a resignation

- 31 -

from was a white male; (2) that judge received a warning; (3) Judge Gallipoli neither suggested that actions would be made public, nor that the judge's career would be damaged; and (4) the other judge was censured for his conduct.  The facts presented by Plaintiff gives rise to an inference that the adverse employment action resulted from discrimination.

Accordingly, the Court finds that Plaintiff has satisfied his burden at step one of the analysis.  Thus, the Court turns to step two.

### ii.      Step Two

Having determined that plaintiff has established a *prima facie* case of discrimination, "the burden of production then shifts to the defendant, who [at step two] must articulate a legitimate, nondiscriminatory reason for [his] actions."  *Davis*, 285 F. App'x at 903.  Judge Gallipoli's attempt at articulating a legitimate, nondiscriminatory reason for his actions is limited to the following arguments: "Plaintiff has failed to set forth a single fact establishing his treatment was different on the basis of his race" (Defs. Moving Br. at 30); and "[t]his case has nothing to do with race, sex, or marital status.  The mere invocation of those words in a complaint does not demonstrate a viable claim under LAD."  (*Id.* at 31).  The Court is not satisfied that Judge Gallipoli has met his burden in advancing a nondiscriminatory reason for his conduct.[15]  Indeed, Judge Gallipoli fails to advance any legitimate, nondiscriminatory reason his conduct.  Instead, Defendant merely quibbles with, and seeks to discredit the allegations contained in Plaintiff's Complaint, of which this Court must accept as true for the purposes of determining whether

---

[15] Judge Gallipoli implies, without specifically arguing, that his actions emanated from Campbell's failure to report his relationship with Kirolos.  Assuming that Judge Gallipoli advanced that argument, the Court would have found Judge Gallipoli's reasoning erroneous based upon the allegations in Campbell's Complaint.  Thus, at step three, the Court would have found Judge Gallipoli's proffered reason to be a pretext for discrimination because at the time Judge Gallipoli sought Campbell's resignation, Judge Gallipoli was unaware of a formal policy that required Campbell to report his relationship.  (*See* Compl. ¶ 50) ("I don't know whether there was a formal policy but I dare say the City must have some sort of policy").

Plaintiff has stated a claim to relief that is plausible on its face.  Because Judge Gallipoli has failed to meet his burden at step two, the Court need not consider whether Defendant's proffered reason was merely a pretext for discrimination.

Thus, for the reasons set forth above, the Court finds that Plaintiff has alleged a *prima facie* case for unlawful racial discrimination under the NJLAD.  Consequently, Defendant's motion to dismiss with respect to this Count is hereby denied.

### b.        Claim of Discrimination Based Upon Plaintiff's Gender[16]

The Court next determines whether Plaintiff's claim for alleged gender discrimination meets the plausibility requirement announced in *Iqbal*.

Under the NJLAD, it is unlawful for an employer, to discharge an employee because of the individual's sex.  N.J.S.A. § 10:5-12.  "The first step of the *McDonnell Douglas* analysis for a reverse gender discrimination claim under the NJLAD retains the traditional requirement that plaintiff establish a *prima facie* case of discrimination; however, the first element of the four-part test is slightly modified for reverse discrimination."  *D'Alessandro v. City of Newark*, No. 08-1886, 2010 U.S. Dist. LEXIS 125964, at *25 (D.N.J. Nov. 29, 2010).  To set forth a *prima facie* case of reverse gender discrimination, a plaintiff must demonstrate that he (1) "'has been victimized by an unusual employer who discriminates against the majority'"; "'(2) was performing his . . . job; (3) suffered an adverse employment action; and (4) similarly situated persons outside his . . . protected group were treated more favorably giving rise to an inference of discrimination.'"  *Id.* at 26 (quoting *Aurelio v. Bd. of Educ. of Carteret*, No. 06-3146, 2009 U.S. Dist. LEXIS 52759, at *8, 9 (D.N.J. June 23, 2009)).

---

[16] Neither party provides the Court with the appropriate standard for this cause of action.

The Court finds that Plaintiff's Complaint, as currently pleaded, fails to set forth a *prima facie* claim for reverse gender discrimination.  In this case, Campbell fails to demonstrate that he has been victimized by an employer who discriminates against the majority, *i.e.*, the male gender.  Plaintiff solely alleges that, "Judge Gallipoli treated Campbell different than Kirolos . . . [when] Judge Gallipoli stated [q]uite frankly, you know, this was a woman who *worked at the Court* and she shouldn't get fired for this relationship."  (*Id.* ¶ 60) (emphasis added).  Plaintiff's belief that he has been discriminated against based upon his gender is flawed.  Indeed, Plaintiff's own allegation highlights Judge Gallipoli's rationale for treating Kirolos in a different manner.  Specifically, Judge Gallipoli asserts that Kirolos should be treated differently because, unlike Plaintiff, she was a full-time municipal court employee.  Further weakening Plaintiff's reverse gender discrimination claim is the fact that Plaintiff has failed to adduce any instance in which Judge Gallipoli discriminated against other male employees.  *See Aurelio*, 2009 U.S. Dist. LEXIS 52759, at *11 ("Plaintiff must set forth evidence showing that the Carteret Board of Education discriminated against males.").  To that end, the Court is not persuaded that Plaintiff has established the first element of the analysis—that Judge Gallipoli discriminates against the majority.  Thus, Plaintiff has failed to state a claim for reverse gender discrimination that is plausible on its face.  Accordingly, Defendant's motion to dismiss with respect to Plaintiff's claim for reverse gender discrimination is granted.

### c.      Claim of Discrimination Based Upon Plaintiff's Marital Status

Campbell also contends that Judge Gallipoli unlawfully discriminated against him based upon his marital status.  In support of that claim, Campbell raises the following allegations: (1) "Judge Gallipoli . . . discriminated against Campbell based on his . . . marital status" (Compl. ¶ 10); (2) "Judge Gallipoli knew or should have known of a number of marriages between New

Jersey judges, supervisors and subordinate judiciary employees" (*Id.* ¶ 88); and (3) "Campbell and Kirolos were not married while married judges and judiciary employees were allowed to continue their relationships . . . without being subjected to punishment." (*Id.* ¶ 89).

In light of the above, the Court finds that Plaintiff has failed to plead a *prima facie* case of unlawful discrimination for the following two reasons. First, Plaintiff's first and second allegations—Paragraphs 10 and 88—are legal conclusions, which under *Iqbal* this Court need not accept. *See Iqbal*, 129 S. Ct. at 1949. Finally, Campbell's allegation that "married judges and judiciary employees were allowed to continue their relationships . . . without being subjected to punishment," (Compl. ¶ 89), amounts to nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* For these reasons, Plaintiff has failed to state a claim to relief that is plausible on its face. Consequently, Plaintiff's claim for unlawful discrimination based upon his marital status will be dismissed.

### 4.        Retaliation Under NJLAD—Count Four

Judge Gallipoli moves to dismiss Count Four of Plaintiff's Complaint contending that Plaintiff's retaliation claim is meritless. Judge Gallipoli asserts that while "Plaintiff . . . claims he was the subject of action after he filed a discrimination complaint against Judge Gallipoli in April 2009 . . . [his] own timeline does not support this novel theory." (Defs. Moving Br. at 31). Specifically, "[t]he actions taken by the ACJC . . . occurred long before plaintiff [sic] filed a discrimination complaint against Judge Gallipoli in April 2009." (*Id.* at 32). Judge Gallipoli's argument is misplaced.

"The [NJ]LAD prohibits employers from taking reprisals or adverse actions against any employee for exercising his or her rights under the statute." *Ferguson v. Deptford Twp.*, No. 06-2112, 2008 U.S. Dist. LEXIS 105144, at *12 (D.N.J. Dec. 22, 2008) (citing N.J.S.A. § 10:5-

12(d)).  To state a *prima facie* case of retaliation under NJLAD, a "plaintiff must show: (1) the employee engaged in a protected activity known to the defendant; (2) the employee was thereafter subjected to an adverse employment decision; and (3) there was a causal link between the two."  *Gardner v. United States Food Serv., Inc.*, No. 08-5381, 2010 U.S. Dist. LEXIS 25929, at *12 (D.N.J. Mar. 19, 2010) (quoting *Ivan*, 595 F. Supp. 2d at 428).  "Once the plaintiff establishes the *prima facie* elements of retaliation, then the defendant must provide legitimate, non-retaliatory reasons for the employment decision."[17]  *Ferguson*, 2008 U.S. Dist. LEXIS 105144, at *13 (internal citation omitted).  "At that point, the plaintiff has the burden to present evidence of the employer's discriminatory motive to demonstrate that the legitimate reasons articulated by the employer were merely a pretext for discriminatory intent."  *Ibid.* (internal citation omitted).

In support of his claim for retaliation, Plaintiff alleges the following facts: (1) in April 2009, Campbell filed a discrimination complaint against Judge Gallipoli (Compl. ¶ 119); (2) Judge Gallipoli compelled adverse action against Campbell in response to the discrimination complaint (*id.* ¶ 120); (3) Judge Gallipoli intentionally delayed the resolution of the ACJC complaint filed against Campbell (*id.* ¶ 69); and (4) "[t]he actions of [the] Defendant[] . . . violated Campbell's right to be free from adverse action for exercising a protected right."  (*Id.* ¶ 121).

The Court finds that Plaintiff has stated a claim for retaliation that is plausible on its face.  First, Campbell alleges that he filed a discrimination complaint against Judge Gallipoli in April 2009, which this Court construes to be a protected activity.  *See McBride v. Princeton Univ.*, No.

---

[17] The Court notes that the Defendant's briefing did not provide a legitimate, non-retaliatory reason for the alleged adverse employment decision.

90-838, 1991 U.S. Dist. LEXIS 5677, at *9 (D.N.J. Apr. 24, 1991) ("plaintiff was engaging in a statutorily protected activity [] when she filed her discrimination claim"). Plaintiff further alleges that as a result of engaging in this activity, Judge Gallipoli compelled adverse action against him. Specifically, Judge Gallipoli delayed the resolution of the ACJC complaint that had been filed against Campbell. [18] The delay, according to Campbell, caused "prolonged damage to his reputation, emotional distress, loss of business opportunities, and other damages." (*Id.* ¶ 69). With respect to this claim, Plaintiff has satisfied the requisite pleading standard, therefore, Defendant's motion is denied.

### 5. Unlawful Interference with Prospective Economic Advantage—Count Seven[19]

Judge Gallipoli moves to dismiss Count Seven of Plaintiff's Complaint, which seeks damages for unlawful interference with prospective economic advantage.

To establish such a claim, Campbell must plead the following: (1) that he had a reasonable expectation of an economic benefit; (2) Defendant's knowledge of that expectancy; (3) Defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the claimant would have received the economic benefit, but for the Defendant's interference; and (5) damages resulting from the Defendant's interference. *FDIC v. Bathgate*, 27

---

[18] To support this theory Campbell includes a chart displaying the length of time it took to resolve his ethics complaint against the complaints filed against other judges for alleged violations of judicial misconduct.

[19] As a preliminary matter, Judge Gallipoli contends, without citation to legal authority and without analysis, that he is "entitled to immunity under N.J.S.A. 59:3-2(a) and 59:3-2(b) for [his] discretionary and judicial actions." This Court will not, nor should it, consider this issue in the abstract without legal reasoning provided by the party seeking to avail itself of immunity.

F.3d 850, 872 (3d Cir. 1994) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993)).[20]

In Count Seven, Campbell alleges that "Judge Gallipoli . . . intentionally interfered with Campbell's prospective economic advantages which included employment and business opportunities after Campbell chose not to resign." (Compl. ¶ 134). "As a result of [Judge Gallipoli's] unlawful conduct, Campbell has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other such damages compensable under . . . New Jersey Law." (*Id.* ¶ 135).

The Court finds that Plaintiff has failed to plead the requisite elements to state a *prima facie* case for unlawful interference with prospective economic advantage for the following three reasons. First, based upon the allegations in Plaintiff's Complaint—as currently pleaded—the Court cannot determine the specific way in which Plaintiff believes that Judge Gallipoli unlawfully interfered with Campbell's prospective economic advantage. Specifically, Campbell solely alleges that "Judge Gallipoli aided and abetted by another interfered with Campbell's prospective economic advantages . . . after Campbell chose not to resign."[21] However, Campbell does not identify the ways in which Judge Gallipoli unlawfully interfered with his prospective economic advantage. Instead, Plaintiff "incorporates by reference each and every allegation

---

[20] The Court notes that neither Plaintiff nor Defendants provided the relevant legal standard, as well as an accompanying legal argument, for this cause of action. (*See* Defs. Moving Br. at 34; Pl. Opp. Br. at 22).

[21] Thus, for example, the Court cannot determine whether the alleged unlawful interference is the temporary suspension which was accompanied by Judge Gallipoli's email to Judge Carchman requesting that a complaint be filed with the ACJC (*id.* ¶¶ 37, 40); Plaintiff's allegation that Judge Gallipoli intentionally delayed the resolution of the outcome of Campbell's disciplinary proceedings (*id.* ¶ 69); or that "members of the judiciary were making unofficial contact with members of the ACJC panel to ensure that Campbell would receive a recommendation of punishment as a cover up for the coordinated acts of [Defendants]. (*Id.* ¶ 98).

contained in the preceding paragraphs [of his Complaint]." (*Id.* ¶ 133). Further muddying this issue is that Plaintiff, rather than explaining how his factual allegations relate to the relevant legal standard, merely contends that "Defendants' arguments under Point VIII . . . amounts [sic] to a motion for summary judgment that would be improper at this stage . . . ." (Pl. Opp. Br. at 22). Consequently, the Court cannot determine, as the Complaint is currently pleaded, Plaintiff's theory as to the ways in which Judge Gallipoli unlawfully interfered with Plaintiff's prospective economic advantage.[22]

Finally, Campbell has failed to allege that there was a reasonable probability that he would have received the economic benefit, but for Judge Gallipoli's interference. *See FDIC*, 27 F.3d at 872. Therefore, Campbell has failed to state a *prima facie* claim for unlawful interference with prospective economic advantage. Accordingly, the Court will grant Defendant's motion to dismiss with respect to this Count.

### 6. Intentional Infliction of Emotional Distress—Count Nine

Judge Gallipoli has also moved to dismiss Count Nine of Plaintiff's Complaint, which alleges intentional infliction of emotional distress. Judge Gallipoli's argument is twofold. First, Judge Gallipoli contends that Campbell's claim for intentional infliction of emotional distress is barred by the New Jersey Tort Claims Act, which precludes the recovery of damages against public entities and employees for pain and suffering except in limited circumstances not applicable here.[23] (Def. Moving Br. at 33). Second, Judge Gallipoli claims that "the facts of the

---

[22] For that reason, Plaintiff's allegations under Count Seven fail to "give the defendants fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545.

[23] The Court declines Defendant's invitation to consider, at this time, whether Plaintiff's claims are barred under the New Jersey Tort Claims Act. Discovery has yet to unfold, and the Court's independent research has led to the conclusion that this is a matter best resolved through summary judgment. *See, e.g.*, *R.K. v. Y.A.L.E. Schs,. Inc.*, 628 F. Supp. 2d 188, 201 (D.N.J. 2008) ("Dismissal under Rule 12(b)(6) . . . is only appropriate where plaintiff's own allegations show that a defense exists that legally defeats the claim for relief. In light of Plaintiffs' claims that they

instant case certainly do not support a claim for intentional infliction of emotional distress." (*Id.* at 36).  This Court agrees.

It is beyond cavil that "to establish a claim for intentional infliction of emotional distress, the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 365 (1988).  First, a plaintiff must prove that the defendant intended "both to do the act and to produce emotional distress." *Ibid.*  The defendant will also be liable if he acted in "deliberate disregard of a high degree of probability that emotional distress will follow." *Ibid.*  Second, the defendant's actions must be "so outrageous in character, and so extreme in degree, as to go beyond possible bounds of decency . . . and utterly intolerable in a civilized community." *Ibid.* (quoting Restatement (Second) of Torts, § 46 comment d (1965) (Restatement)).  Third, defendant's actions must have been the proximate cause of plaintiff's emotional distress.  Fourth, the emotional stress must be "so severe that no reasonable man could be expected to endure it." *Ibid.*

"Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." *Bonner v. N.J.*, No. 10-2684, 2012 U.S. Dist. LEXIS 9629, at *14 (D.N.J. Jan. 27, 2012) (internal citation and quotation marks omitted).  Moreover, a court may dismiss a claim for intentional infliction of emotional distress if it cannot "imagine a set of facts that might demonstrate 'extreme and outrageous' conduct on the part of the [d]efendant." *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 348 (D.N.J. 2006).  Indeed,

---

suffered extreme depression as a result of Defendants' conduct, the Court cannot conclude that they have *not* suffered a permanent loss of incurred medical expenses in excess of $ 3,600.00.  Of course, if upon a later motion for summary judgment, Plaintiffs fail to adduce evidence of a permanent injury and medical expenses exceeding $ 3,600.00.") (emphasis in original).

"courts have found that conduct or decisions made in the employment context rarely 'rise to the level of outrageousness necessary to provide a basis for recovery for intentional infliction of emotional distress.'"  *Iwanicki v. Bay State Milling Co.*, No. 11-1792, 2011 U.S. Dist. LEXIS 140944, at *25 (D.N.J. Dec. 7, 2011) (quoting *Hilburn v. Bayonne Parking Auth.*, No. 07-5211, 2009 U.S. Dist. LEXIS 6762, at *32 (D.N.J. Jan. 29, 2009)).  "Furthermore, the termination of an employee, whatever the secret motive underlying it, is the kind of event that happens every day; such an act is not even a breach of modern-day business etiquette, much less an uncivilized barbarism.  Quite a bit more . . . must accompany a firing if it is to be deemed outrageous."  *Id.* at *26 (internal citation omitted); *see also Borecki v. E. Int'l Mgmt. Corp.*, 694 F. Supp. 47, 61 (D.N.J. 1988) (finding that the termination of a sixty-one year old man, even if discriminatory, did not amount to outrageous conduct).

In Count Nine, Plaintiff alleges that "Defendants actions [sic] . . . amounted to extreme and outrageous conduct that intentionally or recklessly caused Campbell to suffer severe emotional distress," (Compl. ¶ 141), and as a result, Plaintiff "has suffered and continues to suffer economic losses, emotional distress, bodily injury with physical manifestations, physical pain and suffering, harm to his career, harm to his reputation, and other damages . . . ."  (*Id.* ¶ 142).

The Court finds that Plaintiff's claim for intentional infliction of emotional distress fails for the following three reasons.  First, Campbell does not "give [Judge Gallipoli] fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 545.  The pleading standard announced by Rule 8 does not require detailed factual allegations; it does, however, demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949.  Plaintiff's allegations here do not comport with this pleading standard;

- 41 -

rather, Plaintiff merely states that "Defendants actions . . . amounted to extreme and outrageous conduct." (Compl. ¶ 141). Thus, there is no personal connection between Judge Gallipoli and the extreme and outrageous conduct. To that end, Judge Gallipoli and this Court are left speculating as to the grounds upon which Plaintiff's claim rests.

Second, to the extent that Plaintiff seeks relief as a result of his temporary suspension, the law is clear: "conduct or decisions made in the employment context rarely rise to the level of outrageousness necessary to provide a basis for recovery . . . ." *Iwanicki*, 2011 U.S. Dist. LEXIS 140944, at *25. In this case, the conduct or decision at issue was made in the context of Plaintiff's employment as a municipal court judge in Jersey City, New Jersey. Considering the fact that "the termination of an employee, whatever the secret motive underlying it" has been characterized as an every day event such that it "is not even a breach of modern day business etiquette," *id.* at *26, the Court finds that Plaintiff has not alleged any conduct that might be considered "extreme or outrageous" here.

Third, even assuming *arguendo*, that Plaintiff was able to show extreme and outrageous conduct, Plaintiff has not indicated that he suffers from emotional distress "so severe that no reasonable man could be expected to endure it." *Buckley*, 111 N.J. at 365. Plaintiff's allegations relating to his level of emotional distress are contained in consecutive paragraphs. The allegations are: "[t]he Defendants actions [sic] . . . caused Campbell to suffer *severe emotional distress*," (Compl. ¶ 141); and "as a result of Defendants' unlawful conduct, Campbell has suffered and continues to suffer . . . *emotional distress* . . . ." (*Id.* ¶ 142) (emphasis added). Thus, despite the apparent conflict within Plaintiff's allegations, Plaintiff has not alleged that his level of distress is so severe that no reasonable man could be expected to endure it.

Plaintiff has failed to successfully allege the second and fourth elements of this tort. Consequently, Plaintiff has failed to successfully state a claim for intentional infliction of emotional distress that is plausible on its face.  Accordingly, Count Nine of Plaintiff's Complaint will be dismissed.

## VI.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) is denied.  Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted in part and denied in part.  Plaintiff shall have 30 days to file an amended complaint to cure the deficiencies outlined in the Court's Opinion.  An appropriate Order shall follow.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

- 43 -