<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILSON CAMPBELL, <br><br> Plaintiff, <br><br> v. <br><br> SUPREME COURT OF NEW JERSEY, JUDGE MAURICE GALLIPOLI, et al., <br><br> Defendants. | Civil Action No. 11-555 (ES) <br><br> OPINION |

SALAS, DISTRICT JUDGE

This matter comes before the Court on Defendant Assignment Judge Maurice Gallipoli's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. No. 87). The Court has considered the parties' submissions and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b). Based on the reasons discussed below, Defendant's motion for summary judgment is hereby GRANTED.

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Pro se Plaintiff Wilson Campbell served as a municipal state court judge in Jersey City, New Jersey from October 2007 to October 23, 2009.[2] (D.E. No. 1, Complaint ("Compl.") ¶ 25). In April 2008, Plaintiff became involved in a dating relationship with Ann Kirolos, who was employed by the Jersey City municipal court as a bailiff. (*Id.* ¶ 30). Although the parties agree that Kirolos served as a bailiff in Plaintiff's courtroom for a period of time, Plaintiff disputes

---

[1] The following facts are undisputed unless otherwise noted.
[2] At the same time, Plaintiff served as an attorney and practiced law in the state of New Jersey. (Compl. ¶ 11).

1

Defendant's characterization that Kirolos was "assigned" to Plaintiff's courtroom. (Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("SMF") ¶¶ 12, 15).[3]

On June 27, 2008, Defendant learned that Kirolos had ingested an unknown quantity of Xanax in response to her relationship with Plaintiff. (*Id.* ¶ 2). According to Kirolos, she was involved in an intimate relationship with Plaintiff and "he wasn't treating [her] properly." (D.E. No. 87-11, Ex. 8, Transcript of Ann Kirolos Interview ("Kirolos Tr.") at 8:25-9:1). Kirolos "couldn't deal with him" because she was in his courtroom and felt "very sad, distraught and anxious." (*Id.* at 9:3-5). So, she began to take Xanax. (*Id.* at 9:7). At one point, she "didn't even know how many" pills she had taken and agreed to go to the emergency room upon the suggestion of her supervisor. (*Id.* at 10:9-25).

Following the incident, Defendant arranged a meeting with Plaintiff, Trial Court Administrator Joseph Davis, and Chief Judge Nesle Rodriquez. (D.E. No. 88-2, Ex. B, Transcript of Hon. Maurice J. Gallipoli Interview ("Gallipoli Tr.") at 5:16-17, 6:20-23). At the meeting, which was held on June 30, 2008, Defendant confronted Plaintiff with the allegations that he was involved in a relationship with Kirolos. (*Id.* at 6:7). Furthermore, Defendant told Plaintiff that he should "seriously consider resigning." (*Id.* at 8:2-3). Plaintiff had until 3:00 P.M. that afternoon to notify Defendant of his decision. (*Id.* at 8:4-5).

That same day, Defendant sent an email to the Acting Director of Administrative Office of the Courts of the State of New Jersey ("AOC") describing the meeting with Plaintiff and recommending that Plaintiff be suspended. (SMF ¶ 5). Before the 3:00 P.M. deadline, Plaintiff called Defendant to give notice that he was not going to resign. (Gallipoli Tr. at 11:3-6).

---

[3] The Court will cite to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts because this document contains both Defendant's statements and Plaintiff's responses.

At this point, the parties' factual accounts diverge. Plaintiff claims that on June 30, 2008, Defendant ordered him not to return to work. (Compl. ¶ 38). Defendant denies this allegation. (D.E. No. 88-7, Ex. G, Defendant's Responses to Plaintiff's Request for Admissions ¶ 20; D.E. No. 42, Answer to Complaint ("Answer") ¶ 38). Both parties agree, however, that only the Supreme Court of New Jersey had the authority to suspend Plaintiff and it took no such action. (SMF ¶ 7).

After Plaintiff notified Defendant that he was not going to resign, Defendant sent an email to Judge Rodriquez, stating that "[u]ntil Chief Justice/Court decides on suspension or not (they may not suspend him), he should be allowed to resume sitting as he previously did . . . ." (D.E. No. 88-4, Ex. D). Defendant sent the email on June 30, 2008, at 4:36 P.M. (*See id.*).

Plaintiff contends that he was scheduled to take the bench at 5:00 P.M. on the evening of June 30, 2008, and that Defendant sent the email to Judge Rodriquez a little too late. (D.E. No. 88, Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp. Br.") at 6). According to Plaintiff, because he had already perceived that Defendant had the apparent or actual authority to suspend him, he was not on standby waiting to resume his judicial duties. (*Id.*). As such, Plaintiff claims that he did not perform his judicial duties on June 30, 2008. (*Id.*).

The following day, Defendant sent a more detailed email to the Acting Director of the AOC regarding the meeting with Plaintiff. (SMF ¶ 8). Based on this information, the Advisory Committee on Judicial Conduct ("ACJC") opened an investigation into Plaintiff's relationship with Kirolos. (*Id.* ¶ 11). On September 28, 2008, the ACJC interviewed Kirolos and Assistant Court Administrator Rebecca Mason. (D.E. No. 88-9, Ex. I; D.E. No. 87-11, Ex. 8). On January 14, 2009, the ACJC interviewed Defendant. (*See* Gallipoli Tr.). Judge Rodriquez was

interviewed later that year on December 16, 2009. (*See* D.E. No. 88-5, Ex. E). All interviews were conducted under oath. The ACJC did not interview Plaintiff during its investigation. (Compl. ¶ 41).

On February 2, 2009, the ACJC filed a formal complaint against Plaintiff for violating the Judicial Canons of Ethics. (SMF ¶ 27). The ACJC complaint charged Plaintiff with violating Canon 1 and Canon 2A of the Code of Judicial Conduct for engaging in an intimate relationship with a subordinate employee over whom he had supervisory control. (*See* D.E. No. 87-14, Ex. 11 ¶ 9). On February 26, 2009, Plaintiff filed an answer to the ACJC complaint. (SMF ¶ 28). In his answer, Plaintiff admitted that he failed to disclose his relationship with Kirolos to his supervisors. (D.E. No. 87-15, Ex. 12 ¶ 7).

On April 4, 2009, Plaintiff filed an Equal Employment Opportunity ("EEO") complaint against Defendant with the Equal Opportunity Unit of the AOC. (SMF ¶ 36). In his EEO complaint, Plaintiff stated that Defendant "consciously and intentionally treated [him] different from [his] white counterpart." (D.E. No. 87-22, Ex. 19). Plaintiff alleges, and Defendant disputes, that when Defendant learned that Superior Court Judge Lawrence DeBello "exchanged inappropriate, intimate emails with a former law clerk," (D.E. No. 88-17, Ex. Q at 1), Defendant treated him more favorably, despite believing that both situations were inappropriate. (Pl. Opp. Br. at 10). In furtherance of this argument, Plaintiff's Complaint and brief in opposition to the instant motion contained charts that compared the incidents, including descriptions of Defendant's involvement, the time it took the ACJC to complete its investigation, and the subsequent disciplinary action taken by the New Jersey Supreme Court. (Compl. at 13; Pl. Opp. Br. at 11-12). Defendant admitted that he did not suggest that Judge DeBello resign. (Gallipoli

4

Tr. at 13:12-15). However, according to Defendant, he thought that Plaintiff should resign because Plaintiff's judgeship was a part-time position. (*Id.* at 13:16-17).

On October 23, 2009, Plaintiff resigned from his position as municipal court judge. (SMF ¶ 38). Thereafter, the ACJC issued its presentment on the investigation to the New Jersey Supreme Court on February 20, 2010. (SMF ¶ 33). In its presentment, the ACJC found that judges engaging in intimate relationships with subordinate employees created a sense of impropriety. (D.E. No. 87-19, Ex. 16 at 13). The ACJC found that Plaintiff violated the Code of Judicial Conduct by failing to disclose his relationship with Kirolos so that the Judiciary could change their reporting relationship in order to eliminate the sense of impropriety. (*Id.* at 11). As a result, the ACJC suggested that the Supreme Court publicly reprimand Plaintiff. (*Id.* at 1).

On January 28, 2011, the New Jersey Supreme Court issued its order publicly reprimanding Plaintiff. (SMF ¶ 34). Plaintiff attempted to appeal the order to the United States Supreme Court, but was denied Writ of Certiorari. (SMF ¶ 35).

In March of 2011, Judge Glenn A. Grant, the Acting Administrative Director of the Courts, issued Plaintiff a letter stating that his EEO complaint was groundless. (*Id.* ¶ 37). By this time, Plaintiff had already filed his Complaint in District Court for the District of New Jersey on January 31, 2011. (*See* Compl.).

Originally, Plaintiff filed suit against the Supreme Court of New Jersey, Judge Maurice Gallipoli, Candace Moody, Disciplinary Counsel for the ACJC, John Tonelli, Executive Director of the ACJC, and John Doe Employees I-X. (Compl. at 1). Plaintiff's Complaint raised eleven causes of action, including federal discrimination claims. (*See* Compl.).

On June 15, 2011, all of the defendants moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. (D.E. No. 8). The Court denied the

original defendants' motion to dismiss for lack of subject matter jurisdiction, but granted in part and denied in part their motion to dismiss for failure to state a claim. (D.E. No. 33, Opinion at 43). In doing so, the Court dismissed all but Count Three and Count Four of the Complaint, which left Defendant Judge Maurice Gallipoli as the last remaining named defendant.

Following discovery, Defendant filed the instant motion for summary judgment. (D.E. No. 87). During the briefing process, United States Magistrate Judge Joseph A. Dickson issued a letter order denying Plaintiff's request to withdraw his answer to one of Defendant's requests for admissions ("RFA"). (D.E. No. 93, Letter Order ("L. Order") at 1). The RFA in dispute asked Plaintiff to admit or deny that "Plaintiff was never suspended from his position as a Municipal Court Judge." (*See* D.E. No. 82). Plaintiff admitted that he was never suspended.[4] (*Id.*; L. Order at 2). However, he later sought to amend or withdraw this admission on the ground that the RFA was ambiguous and could be interpreted to mean that he was never suspended by the New Jersey Supreme Court or that he was never suspended by Defendant. (*See id.*). In his request to Judge Dickson, Plaintiff argued that he believed the RFA questioned whether he was suspended by the Supreme Court, not by Defendant. (*See id.*). Judge Dickson's letter order noted that "Defendant provided evidence suggesting that Judge Gallipoli could not and did not suspend Plaintiff." (L. Order at 2). This was in response to Defendant's email to Judge Rodriquez, produced during discovery, where Defendant stated that Plaintiff could take the bench until the Chief Justice decided whether to suspend Plaintiff. (*Id.* at 2 n.2).

Following Judge Dickson's letter order denying Plaintiff request, Plaintiff was allowed to file a three-page sur-reply to Defendant's reply brief addressing how Judge Dickson's order

---

[4] Plaintiff failed to timely admit or deny this Request for Admission. (L. Order at 2). As such, it was deemed admitted. (*Id.*).

impacted his case. (D.E. No. 99). Defendant was allowed to respond. (D.E. No. 100). Defendant's summary judgment motion is now ripe for adjudication.

## II.  JURISDICTION

Originally, the Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). (D.E. No. 33, Opinion at 1). The Court exercised supplemental jurisdiction over Plaintiff's related New Jersey state law claims pursuant to 28 U.S.C. § 1367. (*Id.*). However, supplemental jurisdiction was essentially destroyed when the Court dismissed Plaintiff's federal claims, allowing only the state law claims to survive the motion to dismiss.

Nevertheless, a district court has the discretion to retain jurisdiction over a party's state law claims when the federal claims are dismissed if doing so would promote efficiency and conserve judicial resources. *See United States v. Gillette*, 738 F.3d 63, 73 (3d Cir. 2013); *Lopresti v. Cnty. of Lehigh*, 572 F. App'x 133, 135 (3d Cir. 2014). Based upon these factors, including fairness to the parties, the Court decided to retain jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## III.  LEGAL STANDARD

A court shall grant summary judgment under Rule 56 of the Federal Rules of Civil Procedure, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The mere existence of an alleged disputed fact is not enough, the opposing party must prove that there is a genuine issue of a material fact. *Id.*

An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is material if under the governing

7

substantive law a dispute about the fact might affect the outcome of the lawsuit. *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.*

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial. *See id.* at 324. To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, the nonmoving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the nonmoving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

**IV.  DISCUSSION**

Count Three and Count Four of Plaintiff's Complaint were the only claims to survive Defendant's motion to dismiss. Each Count sets forth a cause of action under the New Jersey Law Against Discrimination ("NJLAD"). Count Three alleges a cause of action based on racial discrimination, while Count Four alleges retaliation against Plaintiff for engaging in protected activity. The Court will address Plaintiff's NJLAD claims as they relate to racial discrimination first; Plaintiff's claims of retaliation will be addressed independently.

**A.  Racial Discrimination**

The NJLAD makes it unlawful "[f]or an employer, because of race . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

8

N.J.S.A. 10:5-12(a). When analyzing claims of discrimination under the NJLAD based on circumstantial evidence, the Court must utilize the *McDonnell Douglas-Burdine* burden shifting framework at the summary judgment stage. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008) (applying the *McDonnell Douglas-Burdine* burden shifting framework to NJLAD claims). The *McDonnell Douglass-Burdine* burden shifting framework is comprised of three steps. First, a plaintiff must establish a *prima facie* case of discrimination. *Davis*, 285 F. App'x at 903 (citing *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 506 (1993)). Although the defendant may have the chance to dispute the plaintiff's claims of discrimination at step two, a court may only consider the plaintiff's evidence when determining whether a *prima facie* case exists at step one. *Rogers v. Alternative Resources Corp.*, 440 F. Supp. 2d 366, 370 (D.N.J. 2006).

Once the plaintiff has established a *prima facie* case, the court moves to step two, where the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for its actions. *Davis*, 285 F. App'x at 903 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 506-07). At step three, the burden shifts back to the plaintiff to show that the defendant's reasons for its actions were not the true reason, but merely a pretext for discrimination. *Id.* The ultimate burden of persuading the court that the defendant discriminated remains with the plaintiff at all times. *Id.* (citing *Burdine*, 450 U.S. at 253).

In order to establish a *prima facie* case of racial discrimination under the NJLAD, Plaintiff must prove that: (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under

circumstances that give rise to an inference of discrimination. *See Davis*, 285 F. App'x at 903 (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999).

Count Three of Plaintiff Complaint states that Defendant compelled adverse action against Plaintiff based on his race.[5] The Complaint alleges that Defendant attempted to force Plaintiff to resign, sought to punish Plaintiff through the filing of an ethics complaint, and temporarily suspended Plaintiff from his judicial duties on June 30, 2008. (Compl. ¶¶ 38,113-115).

Although he concedes that Plaintiff is a member of a protected class, Defendant argues that Plaintiff has failed to establish a *prima facie* case of discrimination under the NJLAD. In furtherance of this argument, Defendant contends that he cannot be held liable because he was neither an employer nor an aider or abettor within the meaning of the NJLAD.[6] (D.E. No. 88-2, Defendant's Brief in Support of Motion for Summary Judgment ("Def. Mov. Br.") at 8). Furthermore, Defendant argues that Plaintiff did not suffer an adverse employment action. (*Id.*

---

[5] Count Three of Plaintiff's Complaint also alleged discrimination based on Plaintiff's sex or marital status, (Compl. ¶ 115), however, the Court dismissed these claims on Defendant's motion to dismiss. (Opinion at 33-35).

[6] Under the NJLAD, an employer can be held liable for discrimination. N.J.S.A 10:5-12(a). In addition to an employer, the NJLAD makes it unlawful for anyone to aid and abet a violation of the act. N.J.S.A. 10:5-12(d). The Court believes that Defendant had more of supervisory role over Plaintiff than that of an employer, therefore, Defendant cannot be held liable under the NJLAD as an employer. *See Tarr v. Ciasulli*, 181 N.J. 70, 83, (2004) ("Under a plain reading of these definitions an individual supervisor is not defined as an "employer" under the LAD."). However, there is currently conflicting New Jersey state case law on the issue of whether a supervisor can be held individually liable for his or her own acts under a theory of aiding and abetting. *Compare Colello v. Bayshore Cmty. Health Servs,* No. A-3423-08T1, 2010 WL 1753164, at *14 (N.J. Super. Ct. App. Div. Apr. 28, 2010) (declining to extend liability to an individual for its own conduct), *with Rowan v. Hartford Plaza Ltd.,* No. A-0107-11T3, 2013 WL 1350095, at *7 (N.J. Super. Ct. App. Div. Apr. 5, 2013) (finding that an individual can be liable for his or her own affirmative LAD violations). The Court need not reach a decision on this issue because the instant motion is decided in Defendant's favor on other grounds.

at 10). The Court finds that Defendant's second argument—lack of an adverse employment action—is dispositive of this issue.

There are no bright-line rules for defining an adverse employment action in New Jersey. *See Schott v. State of New Jersey*, No. A-2612-04T1, 2006 WL 1911375, at *8 (N. J. Super. Ct. App. Div. July 13, 2006). New Jersey has, however, turned to federal law for guidance to determine what constitutes an adverse employment action. *Id*. The Third Circuit has stated that:

> The Supreme Court has defined a tangible employment action as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits.' . . . Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the *sine qua non*. If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found.

*Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Schott*, 2006 WL 1911375 at *8 ("[N]ot everything that makes an employee unhappy is an actionable adverse action."). The Third Circuit has also noted that an adverse employment action must be severe enough to "alter the employee's 'compensation, terms, conditions, or privileges of employment.'" *Davis*, 285 F. App'x at 903-04 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), *abrogated on other ground*s *by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

First, Plaintiff claims that he suffered an adverse employment action when Defendant sought to file an ethics complaint against him. (Compl. ¶ 14). As an initial matter, the filing of a disciplinary action or an investigation into potential misconduct does not qualify as an adverse employment action in and of itself. *Lovett v. Flemington-Raritan Reg'l Bd. Of Educ.*, 2013 WL 5925615, at *7 (N.J. Super. Ct. App. Div. Nov. 6, 2013). An employee will only have a viable

claim when an investigation leads to a tangible outcome such as suspension, demotion, or termination. *Id*. Here, Plaintiff has not established that Defendant himself filed the ACJC complaint against him, although it is clear from the record that Defendant played an integral part in initiating the investigation. However, neither the investigation nor the complaint led to a tangible outcome. Plaintiff remained on the bench during the investigation until his resignation in October 2009. Furthermore, the only result of the ACJC's complaint and presentment was a public reprimand by the New Jersey Supreme Court. (*See* D.E. No. 87-20, Ex. 17). By the time the Supreme Court issued its order publicly reprimanding Plaintiff on January 28, 2011, he had already resigned from the bench. (*See* SMF ¶¶ 34, 38). Therefore, there was no way the public reprimand could have altered the terms, conditions, or privileges of Plaintiff's employment as a municipal court judge. As such, the Court does not find that these events amount to an adverse employment action.

Plaintiff's second claim is that Defendant compelled an adverse employment action against Plaintiff when he sought Plaintiff's resignation and suspension without justification. (Pl. Opp. Br. at 6). It is undisputed that Defendant thought Plaintiff should resign from the bench. (SMF ¶ 24). Defendant also thought that a suspension might be warranted. (D.E. No. 88-4, Ex. D). However, mere words that lack real consequences cannot be considered adverse. See *Sconfienza v. Verizon Pennsylvania Inc.*, 307 F. App'x 619, 622 (3d Cir. 2008) (holding that "harsh words that lack real consequences" are not sufficiently concrete to be considered adverse employment actions). Defendant's words were not accompanied by real consequences; Plaintiff remained on the bench for almost a year until his resignation in October of 2009. Furthermore, Defendant lacked the authority to significantly affect on the terms of Plaintiff's employment. As such, Plaintiff has failed to establish an adverse employment action.

Lastly, Plaintiff argues that he suffered an adverse employment action when Defendant ordered Plaintiff not to take the bench on June 30, 2008. Although Defendant has denied this allegation, (Answer ¶ 38), Plaintiff has failed to establish a genuine issue of material fact given Defendant's lack of authority to suspend Plaintiff as a matter of law. Furthermore, the Court notes that there are many inconsistencies in Plaintiff's argument. In a deposition, Plaintiff alleged that Defendant demanded that he resign during the June 30, 2008 meeting. (D.E. No. Ex. 13 at 539:16-18). However, when prompted further, Plaintiff did not allege that Defendant took any specific action against him, such as issuing a suspension. In fact, Plaintiff stated that besides the June 30th meeting and subsequent phone call, Plaintiff did not have contact with Defendant regarding Kirolos other than a March 30, 2009 letter from Defendant addressed to both Plaintiff and Kirolos. (*Id.* at 540-541). Furthermore, as Judge Dickson noted in his letter order, Defendant's email to Judge Rodriquez seems to show that Defendant did not and could not suspend Plaintiff. (L. Order at 2). Lastly, Plaintiff admitted that he was not suspended from the bench. (L. Order at 2). This creates serious doubts for the Court.

Nevertheless, even based on Plaintiff's allegations that Defendant ordered Plaintiff not to perform his judicial duties, Defendant never altered the "compensation, terms, conditions, or privileges of [Plaintiff's] employment." *Davis*, 285 F. App'x at 903-04; *see also* N.J.S.A. 10:5-12(a). First, as Plaintiff concedes, only the New Jersey Supreme Court could suspend Plaintiff. (D.E. No. 99, Plaintiff's Reply Letter ("Pl. Reply L.") at 1). Therefore, Defendant lacked the authority to have any significant tangible effect on Plaintiff's employment. Furthermore, after Defendant purportedly ordered Plaintiff not to perform his judicial duties, Defendant advised Chief Judge Rodriquez that Plaintiff was *not* suspended and that he could take the bench. (SMF ¶ 5). Moreover, Defendant did so before Plaintiff was scheduled to sit for night court. As a

result, Plaintiff was free and able to perform his judicial duties on June 30, 2008. There was no "significant disruption" in Plaintiff's working conditions. Without any significant, tangible alteration to Plaintiff's "compensation, terms, conditions, or privileges of employment," Plaintiff has failed to show an adverse employment action. *Id*. Thus, Plaintiff has failed to meet his burden of establishing a *prima facie* case of discrimination. Defendant's motion for summary judgment as to Count Three of Plaintiff's Complaint is granted.

      B.      Retaliation

Court Four of Plaintiff Complaint alleges that Defendant retaliated against him in violation of the NJLAD. First, Plaintiff claims that Defendant compelled an adverse action against Defendant for engaging in an interracial dating relationship. (Pl. Opp. Br. at 19). In particular, Plaintiff contends that Defendant contacted high-ranking officials, falsely characterized Plaintiff's relationship, and "planted a seed" in the mind of the judiciary's hierarchy by suggesting that the relationship was inappropriate. (*Id.*). Likewise, Plaintiff claims that he suffered unlawful retaliation after he filed an EEO complaint against Defendant. (Pl. Opp. Br. at 21, 25). Defendant contends that he is entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff has failed to provide any evidence that Defendant retaliated against Plaintiff. (D.E. No. 94, Defendant's Reply Brief in Support of Summary Judgment ("Def. Reply Br.") at 9). The Court agrees.

Under the NJLAD, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act . . . ." N.J.S.A. 10:5-12(d). A plaintiff establishes a prima facie case of retaliation by showing "(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment

action." *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 939 (3d Cir. 2009) (quoting *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir. 2001)) (internal quotation marks omitted). Under a claim of retaliation, "[t]he standard required to show an adverse employment action differs from the standard used for claims of discrimination." *Davis*, 285 F. App'x at 904 (internal quotation marks omitted). According to the Supreme Court, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks omitted)). Normal petty slights or minor annoyances may not be actionable, but context matters. *Id*. (noting that a change in schedule might not make a difference to some employees, but it could be significant for a single mother).

Regarding his first claim of retaliation, Plaintiff has failed to establish that he engaged in protected activity, thus failing to establish a *prima facie* case of retaliation. Under the NJLAD, "only challenges to discrimination prohibited by the NJLAD—such as discrimination on the basis of race, age, or gender, N.J. Stat. Ann. § 10:5–12(d)—constitute 'protected activity.'" *Ogunbayo v. Hertz Corp.*, 542 F. App'x 105, 107 (3d Cir. 2013) (finding that an employee's complaint that a supervisor wrongly reprimanded her did not qualify as protected activity); *see also Davis v. Supervalu, Inc.*, No. 13-414, 2013 WL 1704295, at *4 (D.N.J. Apr. 19, 2013) (holding that the filing of a worker's compensation claim is not a protected activity because "[i]t does not involve an employee opposing a discriminatory employment practice"). Here, Plaintiff asserts that prior to filing his EEO complaint, Defendant retaliated against him for engaging in an interracial dating relationship by characterizing the relationship as inappropriate and suggesting

that he should resign. (Pl. Opp. Br. at 19). However, engaging in an interracial dating relationship is not protected activity under the NJLAD. Unlike filing a discriminatory complaint for racial or gender discrimination, engaging in an interracial relationship is not a direct challenge to discriminatory conduct that is prohibited by the NJLAD. Thus, Plaintiff has failed to meet the first prong of a retaliation claim.

Plaintiff's other retaliation claims meet the same fate. According to Plaintiff, he suffered unlawful retaliation after he filed his EEO complaint when judiciary official delayed the resolution of his EEO complaint and ACJC complaint. (Pl. Opp. Br. at 21). Furthermore, Plaintiff contends that judiciary officials released confidential information about Plaintiff's EEO complaint in violation of the NJLAD. (*Id.* at 23). Lastly, Plaintiff claims that Judge Rodriquez unlawfully retaliated against him by changing his schedule after he filed his EEO complaint against Defendant. (*Id.* at 25). Although an EEO complaint is considered protected activity, Plaintiff has failed to establish Defendant's role in these alleged retaliatory acts, either as an affirmative actor or an aider or abettor. Plaintiff has also failed to present a fact that could lead the Court to infer that Defendant possibly played a role. All of the allegations and facts surround the actions of others, not Defendant, and bare allegations that Defendant caused these actions are not enough to defeat summary judgment. *See Ridgewood Bd. of Educ.*, 172 F.3d at 252. After years of discovery, Plaintiff has failed to produce any evidence that Defendant played a role in these acts.[7] Furthermore, although Defendant could theoretically be held liable as an aider or abettor, Plaintiff has failed to meet the heightened standard of proving that Defendant knew of the discriminatory conduct and knowingly assisted in the unlawful acts. *See Hurley v. Atlantic*

---

[7] For example, during the retaliation portion in his Brief in Opposition to the Motion for Summary Judgment, Plaintiff focused solely on the actions of other individuals, not Defendant (except for the subsection discussing Defendant's alleged retaliation against Plaintiff for engaging in an interracial relationship).

*City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999) *abrogated on other grounds by Nance v. City of Newark*, 501 F. App'x 123 (3d Cir. 2012). Without more, Plaintiff has simply failed to establish a *prima facie* case of retaliation. Defendant's motion for summary judgment as to Count Four of Plaintiff's Complaint is hereby granted.

## V. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is hereby granted without prejudice. An appropriate Order shall accompany this Opinion.

*/s/Esther Salas*
**Esther Salas, U.S.D.J.**